750 A.2d 292

**Christopher K. ALDRIDGE and Anne–Marie Aldridge, Administrators of the Estate of Katheryne Elizabeth Aldridge, deceased, Appellants,**

v.

**Elizabeth H. EDMUNDS, M.D., Pierantonio Russo, M.D. and St. Christopher's Hospital for Children, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1999.

Decided May 1, 2000.

David C. Federman, Philadelphia, for appellants C. Aldridge, et al.

Allan H. Starr, Philadelphia, Robert Toland, Orlando, FL, for appellee E. Edmunds, M.D.

Richard R. Galli, Francis J. Greek, Philadelphia, for appellee P. Russo, M.D.

Barbara S. Magen, Sheila A. Haren, Philadelphia, for appellee St. Christopher's Hosp.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

The issue presented concerns the use of authoritative texts during the course of an expert witness's direct testimony.

This medical malpractice action arises out of the death of the Appellants' infant daughter, Katheryne Aldridge ("Katheryne"), who was born on September 26, 1990, with a heart defect which remained undiagnosed until July of the following year.[1] Other than her small size and weight, Katheryne exhibited no manifest symptoms at birth, but, beginning when she reached four months of age, her parents noticed, among other things, that she was experiencing restlessness and eating difficulties, and she was failing to gain weight. Katheryne also progressively developed chronic respiratory congestion. She was under the care of Appellee Dr. Elizabeth Edmunds, the Aldridges' family physician. By six months of age, Katheryne exhibited severe congestion, and her weight fell below the fifth percentile on a standardized average scale. At such time, Dr. Edmunds noted that Katheryne appeared thin and old for her age and described her symptomology as a failure to

1. Katheryne's congenital condition included ventricular septum defect, a defect between the left and right ventricles of the heart which permits blood to be shunted between them; and patent ductus arteriosus, which allows blood to pass from the aorta to the main pulmonary artery.

thrive. Thereafter, Dr. Edmunds pursued a course of investigation and treatment which included: blood and fluid tests; weekly weight assessments; consultation with a pediatric physician; dietary substitutions; adjustments to caloric intake; and initiation of iron replacement therapy.

On July 20, 1991, Katheryne developed pneumonia, and her parents brought her to St. Joseph's Hospital in Reading. A chest x-ray was taken and an echocardiogram performed, which showed enlargement of the heart and other irregularities. From these and other tests, medical professionals determined that Katheryne was experiencing severe cardiac and respiratory failures and first diagnosed her heart condition. Katheryne was transferred to Appellee St. Christopher's Hospital for Children (the "Hospital") for further cardiac assessment, where, on July 26, 1991, a cardiac catheterization study was performed, confirming the congenital defects. Corrective surgery was scheduled on an urgent basis, and, during this period, Katheryne underwent treatment for a rash in her vaginal area.

Appellee Dr. Pierantonio Russo performed the corrective surgery on July 30, 1991, prior to which femoral catheters were inserted to permit continuous blood pressure monitoring. Although the surgery initially appeared to have been successful, two days later, Katheryne's heart arrested. Despite efforts to resuscitate her and to sustain breathing and circulation, a neurologist found no evidence of brain cortical or subcortical function, and Katheryne was removed from life support on August 2, 1991. Several days later, in the performance of an autopsy, a pathologist found evidence of infection with a fungus known as candida albicans and issued a report indicating as a cause of death "candida albicans sepsis with septic shock."

On January 13, 1992, Appellants commenced the present action, alleging that Dr. Edmunds negligently misdiagnosed Katheryne's condition, that Dr. Russo, the Hospital and others negligently performed surgical techniques,[2] and that the al-

2. The complaint asserted causes of action against the cardiologist who performed the cardiac catheterization study, on the theory that he had

leged failures to provide care within accepted medical standards contributed to Katheryne's death. At trial, Appellants emphasized that Katheryne's mother was a diabetic, a risk factor relative to congenital defects in offspring, and that despite such risk and Katheryne's symptoms (including her failure to thrive and respiration problems), Dr. Edmunds failed to conduct tests which would have disclosed the heart defects and resulted in earlier treatment at substantially lower risk. Appellants also asserted that Hospital personnel inserted the pre-surgical femoral catheter into an area infected with candida albicans, thus introducing the fungus into Katheryne's system. Appellants presented several expert witnesses to support their claims of non-conformance to accepted medical standards.

Appellees maintained that appropriate care had been rendered, denied that Katheryne's death was attributable to a fungal infection, and further asserted that Katheryne had died as a result of her heart defects and known risks associated with the corrective surgical procedure. Of particular relevance to this appeal, Dr. Edmunds maintained that the care she provided was reasonable because, although it was clear in hindsight that Katheryne's failure to thrive was due to her congenital condition, the clinical picture presented at the time of treatment simply did not suggest heart disease. In support of this defense, Dr. Edmunds offered testimony from Dr. William Mebane, a pediatric and family physician, who indicated that congenital heart malformations are an uncommon cause of failure to thrive; whereas, common causes of the syndrome include dietary problems, hormonal problems and psycho/social problems, avenues of Dr. Edmunds' investigation. Over the objection of Appellants' counsel, Dr. Mebane was permitted to support his diagnosis by reference to excerpts from a textbook on pediatrics, FRANK A. OSKI ET AL., PRINCIPLES AND PRACTICE OF PEDIATRICS (J.B. Lippincott Co.1990), which were enlarged, mounted on posterboard and

introduced candida albicans into Katheryne's system during the procedure. Allegations material to such claims were stricken on preliminary objections asserted by the Hospital, and the parties ultimately stipulated to their dismissal.

marked as an exhibit. The pertinent testimony from Dr. Mebane proceeded as follows:

Q. In essence, what I want to find out from you, Doctor, whether or not your statement to the Jury that there are multiple causes, some common, some uncommon, some rare for failure to thrive, is there support for that statement in standard reputable authoritative texts in pediatrics, and specifically in the Oski text, that we have referred to?

A. Yes. The Oski text, I think, gives you an overview of the multiple causes of failure to thrive and can help put the different causes into some kind of perspective.

Q. I'm going to display, so we can refer to it as necessary, and so the record is clear, what we have done is taken from the Oski text pages 2033 and 2034.

\* \* \*

Q. Is it fair to state that the authors put together in groups first common causes for failure to thrive?

A. Yes. They put together common causes.

Q. And then under common causes, I'm going to skip the area dealing with neglect, and move down to the second most listed common cause, something called non-organic failure to thrive; is that correct?

A. Yes, sir.

\* \* \*

Q. And underneath none organic [sic] failure to thrive, am I correct that there are a number of sub categories that deal with issues of feeding?

A. Yes, sir.

Q. And they include, just to read them off, inadequate volume of feeding; too few feeds per day; too little per feed; inappropriate foods for the age; a whole bunch of things that are noted there. And I'm not going to have you or myself read them all—,

A. Yes, sir.

Q. —but is that kind of the next highest category under failure to thrive?

A. It certainly is.

Q. The thing that is shown is uncommon causes for failure to thrive; is that correct, sir?

A. Yes, sir.

Q. And there are—it's about four or five major headings?

A. Uncommon causes of failure to thrive, yes.

Q. And then below that there are rare causes, a number of those listed?

A. That's correct.

Q. And would you tell the Members of the Jury, where on the list congenital heart disease falls and under which category in the author's text that you're referring to?

A. It falls under the group of uncommon causes, under the sub category of increased metabolism. And under that is chronic respiratory insufficiency, congenital heart disease and malignancies.

Q. It is sort of just on the page at the bottom of the uncommon cause list?

A. Yes, sir.

Dr. Mebane's testimony also referenced a second pediatric text, RICHARD E. BEHRMAN ET AL., NELSON TEXTBOOK ON PEDIATRICS (13th ed. W.B. Saunders Co.1987), which was presented to the jury in a similar manner to establish that the failure to thrive syndrome is commonly associated with underfeeding. After the excerpts were described, authenticated and marked as an exhibit, the following interchange occurred:

Q. Is it fair to state that the first sentence [from the excerpts] talks about restlessness, crying and failure to gain weight adequately?

A. Yes, sir.

Q. And a little bit further down, when it's talking about clinical manifestations of underfeeding, does it talk about constipation, failure to sleep, irritability and excessive crying?

A. It does.

Q. And a little further down in the same sentence, does it talk about the infant assuming the appearance of a, quote, old man, end quote?

A. Yes, it does.

Q. And, Doctor, those particular statements, signs and symptoms, were those ones that you observed in your review of these records as pertaining to Katheryne Aldridge at that general point?

A. Yes. This is the description in the chart.

Q. And in the area that we've been talking about as one of the causes for failure to thrive, one of the common causes, this comes under the heading of what?

A. Underfeeding and/or feeding problems.

Q. And what is it that the Nelson text set forth [sic] as the treatment to try to address that concern? And I'll refer you specifically to the second paragraph, it says what?

A. Well, the treatment consists of increasing the fluid and caloric intake, correcting deficiencies, vitamin, mineral intake, and instructing the mother in the art of infant feeding.

Dr. Edmunds' counsel moved both exhibits into evidence at the close of her defense case.

At the trial's conclusion, the jury rendered a verdict against Appellants and in favor of all Appellees. On appeal, among other issues, Appellants contended that the trial court erred in permitting the use of the excerpts from the texts of Drs. Oski and Nelson in the direct examination of Dr. Mebane. The Superior Court, however, disagreed. Although recognizing the principle that texts and publications may not generally be relied upon to prove the truth of their contents, the Superior Court cited its prior decision in *Nigro v. Remington Arms Co.*, 432 Pa.Super. 60, 637 A.2d 983 (1993), *appeal dismissed,* 540 Pa. 49, 655 A.2d 505 (1995), for the proposition that such materials may be used to bolster or support the credibility of an expert witness. As it also found no merit to the other

issues presented by Appellants, the Superior Court affirmed. *See Aldridge v. Edmunds,* 718 A.2d 335 (Pa.Super.1998) (table).

█  Appellants filed a petition for allowance of appeal raising the sole question of whether the trial court abused its discretion by permitting Appellants' counsel and Dr. Mebane to reference the learned treatises, and we allowed appeal to address this evidentiary question.

█  When offered at a trial to establish principles or theories from their contents, texts and periodicals fall within the traditional definition of hearsay—an extrajudicial declaration offered to prove the truth of the matter asserted. *See Majdic v. Cincinnati Machine Co.,* 370 Pa.Super. 611, 621–22, 537 A.2d 334, 338–39 (1988) (*en banc* ). Thus, at common law, the evidentiary rules restricting the presentation of hearsay statements precluded parties from employing treatise materials as substantive proof of their contents. *See generally* 29A AM. JUR.2D EVIDENCE § 1413 (1994); *Jones v. Constantino,* 429 Pa.Super. 73, 88–89, 631 A.2d 1289, 1297 (1993)(finding that learned writings which are offered to prove the truth of their contents are hearsay and may not properly be admitted into evidence), *appeal dismissed,* 538 Pa. 671, 649 A.2d 673 (1994). The common law rule frequently has been justified on the ground that a lay jury may be confused by the technical nature of the information and therefore place undue emphasis upon or misapply it. *See id.;* W. Kobylak, Annotation, *Treatises, Periodicals, or Pamphlets as Exception to Hearsay Rule Under Rule 803(18) of the Federal Rules of Evidence,* 64 A.L.R. Fed. 971 § 2 (1999)(stating that "[t]he prohibition against receiving learned treatise materials as exhibits is designed to keep the often voluminous works out of the jury room where they would receive undue attention and emphasis, and to prevent a jury from rifling through a work and drawing improper inferences from technical language it might not be able properly to understand without expert guidance" (footnotes omitted)). While other jurisdictions, including the federal courts, have moved away from the common law exclusion

in favor of an exception permitting the admission of treatise materials as substantive evidence on a limited basis, *see, e.g.,* F.R.E. 803(18),[3] Pennsylvania has not done so. *See* P.R.E. 803(18) (providing that "Pennsylvania does not recognize an exception to the hearsay rule for learned treatises" (citing *Majdic,* 370 Pa.Super. at 611, 537 A.2d at 334)).

In the present case, we are not asked to reevaluate this rule in light of the competing policies, but rather, merely to consider the contours of the existing construct. There is no question that if published material is authoritative and relied upon by experts in the field, although it is hearsay, an expert may rely upon it in forming his opinion; indeed, it would be unreasonable to suppose that an expert's opinion would not in some way depend upon the body of works preceding it. Pennsylvania courts have thus permitted, subject to appropriate restraint by the trial court, limited identification of textual materials (and in some circumstances their contents) on direct examination to permit an expert witness to fairly explain the basis for his reasoning. *See* P.R.E. 705 (providing that "[t]he expert may testify in terms of opinion or inference and give reasons therefor"); *see also In re C.R.S.,* 696 A.2d 840, 845 n. 7 (Pa.Super.1997)(suggesting that experts may refer to published works serving as the basis for their opinions). *See generally Cummings v. Borough of Nazareth,* 430 Pa. 255, 265, 242 A.2d 460, 466 (1968) (plurality opinion) (stating that "[i]t is entirely proper in examination and cross-examination for counsel to call the witness's attention to published works on the matter which is the subject of the witness's testimony").[4] Since, however, the purpose for which treatises may be

3. The exception would appear to be based upon the view that a substantial degree of reliability should attach to authoritative, published scientific works, thus supporting the hearsay exception. *See generally* WRIGHT & MILLER, 31 FED. PRAC. & PROC. EVID. § 803(18) (stating that "[t]he foundation of the [rule permitting the proffer of texts and periodicals as substantive evidence] is that a hearsay objection must be regarded as unimpressive when directed against treatises since a high standard of accuracy is engendered by various factors: the treatise is written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake").

4. Our evidentiary rules also permit limited use of treatises on cross-examination for impeachment, *see Jones,* 429 Pa.Super. at 88–89, 631

referenced on direct examination is generally limited to explaining the reasons underlying the opinion, the trial court should exercise careful control over their use to prevent them from being made the focus of the examination. Additionally, the trial court should issue appropriate limiting instructions. *See generally* Pa.R.E. 105 ("[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall, or on its own initiative may, restrict the evidence to its proper scope and instruct the jury accordingly").[5]

In *Nigro* the Superior Court found that authoritative texts could be offered as nonhearsay for the purpose of bolstering the credibility of an expert witness, *see Nigro*, 432 Pa.Super. at 80–81, 637 A.2d at 993–94, implicitly suggesting that this purpose differs from the impermissible objective of attempting to prove the truth of the matter asserted. This rationale, however, is unsound, since there can be no bolstering effect if the published materials are not seen by the jurors as authoritative and thus believable. *See generally Commonwealth v. Sneed*, 413 Mass. 387, 597 N.E.2d 1346, 1350 n. 6 (1992)(equating "bolstering" with proof of the truth of the matter asserted); *Spragg v. Shore Care*, 293 N.J.Super. 33, 679 A.2d 685, 697 (App.Div.1996)(same). It is preferable to recognize the hearsay nature of textual materials, and that, while our appellate courts have not adopted the broad exception to the rule against hearsay statements embodied in F.R.E. 803(18), they have implemented a narrow one. In *Nigro* the references to

A.2d at 1298–99; *Majdic*, 370 Pa.Super. at 621, 537 A.2d at 339, and this Court has not foreclosed the possibility that there may be other valid, nonhearsay purposes that may support the proffer of treatise materials. *Cf., e.g., Fletcher v. Ford Motor Co.*, 128 Mich.App. 823, 342 N.W.2d 285, 288 (1983)(stating that "[l]earned treatises discussing the safety of a product should ... be admissible in the plaintiff's case-in-chief to raise a presumption of notice[;][t]his is a non-hearsay purpose").

5. Rule 105, on its terms, would not apply to authoritative texts as it addresses *admissible* evidence. Nevertheless, the policy underlying the rule, namely, the prevention of juror reliance upon proofs for inappropriate purposes, applies equally in the context of textual materials referenced to explain the basis for an expert opinion.

published materials (authoritative texts related to firearms) . exceeded the bounds of such exception—they were offered for their direct substantive effect, as they were not presented to explain the basis for the expert's own opinion, but rather, to demonstrate more broadly that the opinion "had some concurrence" among the authorities. *See id.* at 81, 637 A.2d at 993.

In the present case, the excerpts from the texts of Drs. Oski and Nelson were expressly presented based upon the *Nigro* logic. No limiting instruction was given to the jury. Most important, the texts were not used to clarify the basis for Dr. Mebane's opinion; rather, Dr. Edmunds' counsel focused upon them as the means through which opinion evidence was conveyed to the jury. Specifically, the textual excerpts were enlarged on posterboard, and Dr. Edmunds' counsel guided Dr. Mebane through a lengthy series of leading questions further emphasizing the specific contents in a manner unnecessary to the explanation of the expert opinion. Additionally, the published materials should not have been offered or admitted into evidence.

■ While we reiterate that, subject to control by the trial court, judicious use of learned treatises may be made on direct examination of an expert witness in appropriate circumstances for the limited purpose of explaining the basis for the opinion, here, the trial court abused its discretion by failing to impose appropriate constraints.

■ It remains to determine, however, whether Appellants are entitled to a new trial, as an erroneous evidentiary ruling will generally require reversal only if it caused prejudice. *See Peled v. Meridian Bank,* 710 A.2d 620, 626 (Pa.Super.1998)(stating that "[a]n evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the [fact-finder]'s judgment")(quoting *Hart v. W.H. Stewart, Inc.,* 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989)). This certainly is not the case with respect to the claims against Dr. Russo and the Hospital, since the purpose for which the texts were offered (to establish that Dr. Edmund's evaluation of Katheryne's failure to thrive was reasonable) had no bearing upon

Appellants' allegations concerning post-diagnosis negligence in the insertion of a pre-surgical catheter. Although the texts were relevant to Appellants' claims against Dr. Edmunds, prior to Dr. Mebane's testimony, Appellants' own expert witness, Dr. Arthur A. Klein, acknowledged both the authoritativeness of the Oski text and that congenital heart disease is an uncommon cause of failure to thrive. Indeed, Dr. Edmunds' counsel was able to use the text to guide Dr. Klein through almost precisely the same litany of root causes of failure to thrive as was presented to Dr. Mebane. *See generally Majdic,* 370 Pa.Super. at 621, 537 A.2d at 339 (stating that "an expert witness may be cross-examined ... with respect to any other publication which the expert acknowledges to be a standard work in the field"). In fact, the points made in both examinations seem to be very basic ones which were undisputed on the record.[6] As Appellants' counsel cogently argued to both the court and jury, regardless of whether congenital heart defects are a common, uncommon, or rare cause of failure to thrive, the central issue was whether Dr. Edmunds should have appreciated the need to explore the possibility, particularly in light of the collective patient history and symptoms presented. Given the nature of the published materials and the limited and essentially undisputed points for which they were presented, we find that their use and admission do not require the award of a new trial.

Accordingly, the order of the Superior Court is affirmed.

Justice NIGRO concurs in the result.

---

6. Similar use was made of Dr. Nelson's text, with the additional point being made that appropriate treatments for one common cause of failure to thrive (underfeeding) include dietary interventions of the sort pursued by Dr. Edmunds.