**Karen BURTON–LISTER, as parent and natural guardian of Tiffany Burton–Lister, a minor and Karen Burton–Lister, in her own right, Appellee,**

v.

**SIEGEL, SIVITZ AND LEBED ASSOCIATES and Jay Sivitz, M.D., Joel Lebed, D.O., and David Klebanoff, M.D., Appellants.**

Superior Court of Pennsylvania.

Argued Dec. 13, 2001.
Filed May 1, 2002.

John P. Shusted, Philadelphia, for appellants.

Gustine J. Pelagatti, Philadelphia, for appellee.

Before JOYCE, OLSZEWSKI and MONTEMURO *, JJ.

MONTEMURO, J.

¶ 1 This is an appeal from a judgment awarding $200,000 to Appellee Karen Burton–Lister, and $1,800,000 to her daughter, minor Appellee Tiffany Burton–Lister, in an action for medical malpractice.

---

* Retired Justice assigned to Superior Court.

¶ 2 On October 18, 1990, Appellee Tiffany Burton–Lister was born by Caesarian section after it became clear that the disproportion between the infant's head circumference and the size of her mother's pelvis made vaginal delivery impossible. Prior to the birth, Appellee Karen Burton–Lister had been given Pitocin to stimulate labor. After approximately seven hours, when labor failed to progress and fetal distress was noted, the surgical delivery was performed; the baby's head was found to be wedged in the mother's pelvis.

¶ 3 When the minor Appellee was one year old, she was diagnosed with brain damage manifested as cerebral palsy and right hemiparesis; later, various cognitive deficits were also noted. This action was commenced on September 28, 1998, alleging that negligence on the part of Appellant obstetricians had resulted in the injuries to the minor Appellee. At trial, the jury awarded Appellee a total of $2,000,000, to which the trial court added $209,929.60 in delay damages. This appeal followed.

The proof required for a *prima facie* showing of negligence is that a duty was owed and breached, the breach was the cause of the injury, and damages resulted from the harm thus caused. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 891 (1990). Where the alleged negligence is medical in nature, the plaintiff must present evidence from a expert "who will testify, to a reasonable degree of medical certainty, that the acts of the [care giver] deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Id.* at 62, 584 A.2d at 892.

*Checchio v. Frankford Hospital–Torresdale Division,* 717 A.2d 1058, 1060 (Pa.Su-

per.1998), *appeal denied*, 566 Pa. 633, 781 A.2d 137 (2001).

¶ 4 Appellants' first claim is that a judgment *notwithstanding the verdict* (JNOV) as to the damages claim of Appellee Karen Burton–Lister should be entered in their favor "because there was not sufficient evidence to sustain the jury's verdict." (Appellants' Brief at 4).

¶ 5 "The entry of judgment notwithstanding the verdict ... is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury." *Neal by Neal v. Lu*, 365 Pa.Super. 464, 530 A.2d 103, 110 (1987) (citations omitted).

¶ 6 The standard to be applied in assessing the validity of a motion for JNOV is that

> [T]he evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, [a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.

*Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (citations omitted). Finally, a JNOV must be denied where conflicting evidence has been presented to the jury. *Farmers' Northern Market Company v. Gallagher*, 392 Pa. 221, 139 A.2d 908 (1958).

¶ 7 Appellants offer alternative reasons why JNOV should be entered: they argue first, that Appellee Karen Burton–Lister's request for damages is time barred, and then insist that because it is outside the scope of the complaint, her claim should not have gone to the jury.

¶ 8 To address these in reverse order, we note, as did the trial court, that in Count VI, Paragraph 43, the allegations (of negligence) advanced in Paragraphs 1–42 are incorporated by reference. In Paragraph 44, Appellee states the following:

> 44. As a result of the maladies sustained by the Minor–Plaintiff, Tiffany Burton–Lister, Parent Plaintiff, Karen Burton–Lister has been forced to expend various and diverse sums of money in an effort to treat and cure Minor-Plaintiff.
>
> WHEREFORE, Parent–Plaintiff, Karen Burton–Lister, demands judgment against the Defendants, in an amount in excess of Fifty Thousand Dollars ($50,000.00).

(Complaint at ¶ 44).

Accordingly, this claim was properly submitted to the jury.

¶ 9 In their limitations argument, Appellants contend that because a parent's cause of action is not derivative of a child's, the two year statute of limitations is applicable and had run by the time Appellee filed her complaint.

¶ 10 The law pertaining to the issue raised herein is well settled:

> [T]he statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations, even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy, this is incident to a law arbitrarily making legal remedies contingent on mere lapse of time. Once the prescribed statutory period has expired, the party is barred from bringing suit unless

it is established that an exception to the general rule applies which acts to toll the running of the statute.

The "discovery rule" is such an exception, and arises from the *inability* of the injured, *despite the exercise of due diligence,* to know of the injury or its cause.

*Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983) (citations omitted) (emphasis in original).

▮▮▮▮ ¶ 11 However,

[w]here "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry," the defendant is estopped from invoking the bar of the statute of limitations. Moreover, defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient. Mere mistake, misunderstanding or lack of knowledge is insufficient however, and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party.

*Molineux v. Reed,* 516 Pa. 398, 532 A.2d 792, 794 (1987) (quoting *Schaffer v. Larzelere,* 410 Pa. 402, 189 A.2d 267, 269 (1963) (citations omitted)).

▮▮▮▮ ¶ 12 Further, "the fact that a plaintiff is not aware that the defendant's conduct is wrongful, injurious or legally actionable is irrelevant to the discovery rule analysis." *Haggart v. Cho,* 703 A.2d 522, 528 (Pa.Super.1997) (citing *E.J.M. v. Archdiocese of Philadelphia,* 424 Pa.Super. 449, 622 A.2d 1388, 1394 (1993)). Once the plaintiff becomes aware of the injury and who occasioned it, she is under a duty to investigate the matter and commence a cause of action. *Id.* at 528–29. "The very essence of the discovery rule in Pennsylvania is that it applies only to those situations where the nature of the injury itself is such that no amount of vigilance will enable the plaintiff to detect an injury." *Dalrymple v. Brown,* 549 Pa. 217, 701 A.2d 164, 170 (1997). Having said so much, we also note that

[t]h[e Pennsylvania Supreme] Court has long held that there are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence. Although reasonable diligence is an objective rather than a subjective standard, "[I]t is sufficiently flexible ... to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." A plaintiff's actions must be evaluated, therefore, to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." In other words, a party is not under an absolute duty to discover the cause of his injury. Instead he must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case.

*Crouse v. Cyclops Industries,* 560 Pa. 394, 745 A.2d 606, 611–12 (2000) (citations omitted).

▮▮▮▮ ¶ 13 In the instant matter, Plaintiff Karen Burton–Lister initially failed to make inquiries because Appellant Dr. Klebanoff explained that her daughter's condition had been an act of God. Because this information had been imparted to her by her doctor, she believed it to be true.

¶ 14 These facts are, as the trial court observes, comparable to the situation in *Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 608 A.2d 1040 (1992). There, the appellant had had a portion of his lung removed after a misdiagnosis of cancer, only discovering that the operation had not been medically necessary, despite his doctor's assurances to the contrary, after another doctor so informed him. Our Supreme Court concluded that although a jury could find the appellant "reasonably should have investigated the need for the surgery at the time he was informed of the misdiagnosis," *id.* at 1043, "[a] jury could ... just as well find that appellant acted reasonably in not investigating further and in being satisfied by appellee's [ ] assurances that the surgery was indeed necessary." *Id.* Thus, the discovery rule operates to confirm the propriety of submitting this claim to the jury.[1]

▆▆▆ ¶ 15 On several grounds, Appellants also claim that the trial court inappropriately refused to grant them a new trial. We will address these claims *seriatim*, albeit not in the precise order presented. We first note, however, that the appellate court will not reverse the trial court's grant or refusal of a new trial unless the decision presents a clear abuse of discretion or an error of law. *Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116, 1122 (2000). "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias or ill-will." *Id.* at 1123. The trial court is required to grant a new trial only where the verdict is "against the clear weight of the evidence or [where] the judicial process has effected a serious injustice." *Austin v. Ridge*, 435 Pa. 1, 255 A.2d 123, 125 (1969) (citing *Pritchard v. Malatesta*, 421 Pa. 11, 218 A.2d 753, 754 (1966)). Further, it is for the factfinder to assess the credibility of witnesses and to determine the weight to be assigned their testimony. *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458 (1998).

▆▆▆ ¶ 16 Appellants first argue that the trial court erred in permitting Appellees to cross examine Appellant Dr. Sivitz using a learned treatise without first laying a foundation. The material in question was an article, published in *The American Journal of Obstetrics and Gynecology* in 1963. Appellants contend that the article had not been established as authoritative in the expert's field pursuant to the requirements of *Cummings v. Borough of Nazareth*, 430 Pa. 255, 242 A.2d 460 (1968), and its progeny.

¶ 17 Both Appellees and the trial court rely on *Aldridge v. Edmunds*, 561 Pa. 323, 750 A.2d 292 (2000), for the proposition that "an expert may be tested by reference to 'standard works.' " (Trial Ct. Op. at 4; Appellees' Brief at 21). This statement of our evidentiary rules, accurate as far as it goes, is nevertheless incomplete. As the *Aldridge* Court points out, "Pennsylvania courts have ... permitted, subject to appropriate restraint by the trial court, **limited** identification of textual materials (and in some circumstances their contents) on direct examination to permit an expert witness to fairly explain the basis for his reasoning." *Id.* at 297 (citations omitted) (emphasis added). The Court further ob-

---

**1.** Appellants argue that the *Hayward* thesis is not available to Appellees because they failed either to file a responsive pleading presenting a factual denial of the [statute of limitations] defense consistent with application of the discovery rule, or to plead sufficient facts to sustain application of the rule in [their] initial complaint pursuant to *Fox v. Byrne*, 363 Pa.Super. 70, 525 A.2d 428 431 (1987). As this contention does not appear in Appellants' post trial motions, it is waived. Pa.R.C.P. 227.1(b)(2).

serves that "our rules permit **limited** use of treatises on cross examination for impeachment." *Id.* (emphasis added). It is clearly the exercise of this latter option by Appellees to which Appellants now object. *See* N.T.,11/15/00, at 449.

¶ 18 Appellant Dr. Sivitz conceded that he subscribed to the publication in question, which, although he did not regard it as authoritative, is recognized as a "standard work" in the field.[2] (N.T., 11/15/00, at 417–18). Appellant Dr. Lebed testified to much the same effect. (N.T., 11/14/00, at 290). Thus, the trial court found, the material was properly used at trial, not "for the truth of the matter asserted, but only to challenge the witness and the weight to be accorded" to his testimony. (Trial Ct. Op. at 4). This statement, while also legally accurate, recites a rule which our Supreme Court has found to be something of a polite fiction.

¶ 19 In *Aldridge,* the Court explained the principle, enunciated in *Nigro v. Remington Arms Company,* 432 Pa.Super. 60, 637 A.2d 983 (1993) appeal dismissed, 540 Pa. 49, 655 A.2d 505 (1995), that authoritative texts may be offered for the purpose of bolstering the credibility of an expert witness. This purpose, the Court noted, implies a distinction from "the impermissible objective of attempting to prove the truth of the matter asserted." *Aldridge, supra* at 297. The Court recognized quite clearly that "[t]his rationale, however, is unsound, since there can be no bolstering effect if the published materials are not seen as authoritative and thus believable." *Id.* That is, not merely the legal status of the publication, but also its subject matter, are routinely offered to bolster, or reinforce, credibility; thus, the book and its cover are, as a practical matter, inseparable. The reverse is also true: attacks on credibility using authoritative texts cannot be successful without a subliminal suggestion that the truth of the matter asserted is contained in the text itself.

¶ 20 Here, the material in question was used in cross examination of a party, not an expert witness. Moreover, those parts of the text which reinforced Appellees' theory of negligence were read into the record, offering, despite the ostensible purpose of the process, an implicit invitation to the jury to view the substance of the material as true. As the appellate courts of this Commonwealth have consistently noted, "learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury." *Majdic v. Cincinnati Machine Co.,* 370 Pa.Super. 611, 537 A.2d 334, 339 (1988) (*en banc*). Further, to counter any suspicion of archaism raised on direct examination, Appellees point out that they also supplied a more recent article which refers to the earlier one. Thus it is easily deducible that what was conveyed to the jury, intentionally or otherwise, was the notion that the matter described in the article was to be accepted as true. For these reasons, we are compelled to conclude that the trial court failed to assure, pursuant to *Aldridge, supra,* that the use made of the publication was "judicious" or "limited" in nature. *Id.* at 298.

¶ 21 The question then becomes whether relief in the form of a new trial is warranted. We find that it is not. Appellants failed to object to the (impermissible) reading of the article, as opposed to the (permissible) inquiries made concerning it, and failed to request a jury charge on the use to be made of the information so provided. Accordingly, we find that because

---

**2.** There is no issue raised here of the actual authority still remaining of an individual article published in 1963, as opposed to the journal in which it appears.

no specific objection was made, the matter is waived. *King v. Pulaski*, 710 A.2d 1200 (Pa.Super.1998).

¶ 22 In their next claim, Appellants assign error to the trial court's decision permitting Appellees' counsel to cross examine Appellant Dr. Lebed concerning his deposition testimony in a prior case involving altered and substituted records. As the trial court points out, Pa.R.C.P. 4020(a)(1) concerning use of depositions at trial, provides in pertinent part that "At the trial, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of a deposition ... for the purpose of contradicting or impeaching the testimony of a deponent as a witness."

¶ 23 The information that Appellant Lebed had, in another matter, admitted changing a record was introduced following a discussion with a nurse/witness concerning a hospital document which contained the words "c/s [caesarian section] fetal distress." (N.T., 11/13/00, at 104–07). The words "fetal distress" had been crossed out and the word "error" inserted above. When counsel inquired of Appellant Lebed on cross examination concerning the alteration, Appellant Lebed responded that if he changed something on a record his practice was to sign and date the change. At that point, counsel referred to Appellant's deposition testimony in *McQuaid v. Suburban General Hospital and Joel Lebed.* In that case, also a medical malpractice action, Appellant Lebed admitted having added information to existing medical records without, apparently, initialing or dating the additions, and with the intention of protecting himself from liability. When defense counsel objected, the trial court ruled that the line of questioning was permissible for impeachment purposes. We find no error in the trial court's ruling.

¶ 24 Next Appellants argue that the trial court erred in charging the jury on increased risk of harm. As Appellants correctly observe, the governing case on this point is *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 895 (1990). There, our Supreme Court enunciated the tripartite test that if sufficient evidence is presented to establish a physician's failure to exercise reasonable care, that such failure increased the risk of harm, and that such harm actually occurred, the question of proximate cause is for the jury.

¶ 25 However, as the trial court found, the obstetrical expert presented by Appellees challenged Appellants' observance of the standard of care in several respects so as to raise the issue of increased risk of harm. The jury instruction was therefore appropriate.

¶ 26 Appellants' final contention is that the trial court erred in permitting Dr. Leon Charash, designated by Appellees as their causation expert (Appellees' Brief at 12), to offer an opinion inconsistent with his report. Specifically, they claim that until the expert testified, no causative nexus was drawn between any act of theirs and the minor plaintiff's injuries.

¶ 27 Admission and rejection of expert evidence is assigned to the sound discretion of the trial judge, whose conclusions, as to this sort of evidence as well as others, are tested by an abuse of discretion standard. *Tiburzio–Kelly v. Montgomery*, 452 Pa.Super. 158, 681 A.2d 757 (1996).

¶ 28 Moreover, Pa.R.C.P. 4003.5(c) provides in pertinent part:

To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings ... the direct testimony of the expert at the trial may not be inconsistent with or go

beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the ... separate report, or supplement thereto.

¶ 29 The question of whether the permissible limits of testimony under the Rule have been violated is to be determined on a case by case basis, and the essence of the inquiry is fairness. *Walsh v. Kubiak* 443 Pa.Super. 284, 661 A.2d 416 (1995) (citing cases). The fairness of the court's decision is gauged by whether the opposing party has sufficient notice of the expert's opinion to fashion a meaningful response. *Jones v. Constantino,* 429 Pa.Super. 73, 631 A.2d 1289 (1993), *appeal denied,* 538 Pa. 671, 649 A.2d 673 (1994).

¶ 30 Here, the sole conclusion expressed in the expert's initial report of 4/4/00, consists of the following: "[The plaintiff's] problems are causally related to intrapartum factors including hypoxemia, ischemia and trauma." (Report of Dr. Charash, 4/4/00, at 3). The expert's report of 4/21/00, contains no mention of causation, and the second of the two sentences which comprise his third report, of 4/24/00, repeats the original conclusion without clarification as to etiology: "Needless to say, the entire constellation of Tiffany's static encephalopathy including her cerebral palsy, retardation, learning problems and orthopedic deformities are all causally related to peripartum factors including hypoxemia, ischemia and trauma." (Report of Dr. Charash, 4/24/00). The expert's deposition testimony, however, introduced at trial, supplies the missing nexus with Appellants' acts or omissions. There, Dr. Charash testified that ischemia,[3] lack of blood circulation, identified at trial as the operative cause of the minor plaintiff's cerebral palsy, was itself occasioned by compression of the baby's skull after administration of the drug Pitocin induced labor, forcing the infant's head into the mother's (insufficiently large) pelvis where it became compressed. The ischemia/insufficient blood circulation to the brain resulted in insufficient oxygenation, or hypoxia; the damage ensued from the hypoxia. Dr. Charash further opined that in cases of cephalopelvic disproportion, such as Appellee's, Pitocin should never be administered. Despite the trial court's determination that this testimony was within the fair scope of the expert's report, we cannot agree.

¶ 31 Interestingly, in their brief, Appellees catalogue 8 causative factors "listed" by Dr. Charash in his testimony. Of these, only a portion of number, 8 "lack of blood circulation to the brain (ischemia)," (Appellees' Brief at 23; Report of Dr. Charash, 4/4/00, at 3) is specifically denominated in the report as causative. However, even there, the lack of a direct link is clear. The same report notes, without elaboration or further reference, that "Subsequent imaging studies have revealed an infarct in the left cerebral hemisphere." (Report of Dr. Charash, 4/4/00, at 2). Appellees' (accurate) recitation of the testimonial evidence on this point is far more expansive: "The infarct revealed by the CT.scan taken of Tiffany Lister almost one year later was due to the lack of blood circulation to the brain (ischemia) during the delivery process." (Appellees' Brief at 23). As to the remaining causes, most are included as narrative details. For example, Appellees extract from Dr. Charash's causation testimony the opinion that Pitocin should never be used when cephalopelvic disproportion is present, and that the drug can and did cause brain damage.

3. The hypoxemia and trauma referred to in the first and third expert's reports were essentially abandoned as operative causes.

However, the report's sole reference to Pitocin is contained in the sentence "Oxytocic augmentation had been employed." (Report of Dr. Charash, 4/4/00, at 1).[4] Nowhere is the putative culpability of Pitocin as the/a source of the minor Appellee's injuries even suggested. Indeed, cephalopelvic disproportion, which Appellees place first on the list of factors responsible for the child's cerebral palsy, receives no mention at all in any of the expert's reports. The first report also states, in its sole reference to the matter, that "A cephalohematoma was also noted on the right with discoloration over the top of the head." (Report of Dr. Charash, 4/4/00, at 1). Appellees, however, describe his testimony as positing the theory that "cephalohematoma which is always pathologic ... caused a bone hemorrhage into the skull." (Appellees' Brief at 22). In fact, none of the causative factors to which the expert testified can be found in any of his reports; no connection was ever drawn between "hypoxemia, ischemia and trauma," (*id.* at 3) and a mechanism, related to Appellants' actions or omissions, creating those conditions. Accordingly, we find that the trial court erred in concluding that the expert's testimony did not exceed the scope of his report(s).

¶ 32 Our examination does not end at this point, however. As noted in *Jones,* supra, the intention behind Rule 4003.5, is to provide the opposing party sufficient notice of the expert's theory to allow a substantial rejoinder, that is, "the tenor of our prior precedent requires prejudice to the opposing party before an opinion given outside the scope of an expert report is considered reversible error." *Id.* at 1295. Prejudice is a concern when the testimony which exceeds the scope of the report "would prevent the adversary from preparing a meaningful response, or ...

would mislead the adversary as to the nature of the appropriate response." *Dible v. Vagley,* 417 Pa.Super. 302, 612 A.2d 493, 499 (1992), *appeal denied,* 535 Pa. 619, 629 A.2d 1380 (1993) (quoting *Wilkes–Barre Iron v. Pargas of Wilkes–Barre,* 348 Pa.Super. 285, 502 A.2d 210, 212–213 (1985)). "We will not find error in the admission of testimony that the opposing party had notice of or was not prejudiced by." *Petrasovits v. Kleiner,* 719 A.2d 799, 804 (Pa.Super.1998). *See also Coffey v. Minwax Co., Inc.,* 764 A.2d 616 (Pa.Super.2000); *Brady v. Ballay, Thornton, Maloney Medical Associates, Inc.,* 704 A.2d 1076 (Pa.Super.1997), *appeal denied,* 555 Pa. 738, 725 A.2d 1217 (1998).

¶ 33 Although Appellants assert, in one sentence, (Appellant's Brief at 22) that Dr. Charash's testimony caused them significant prejudice, their protestation is *pro forma,* as they provide no explanation of how they were prejudiced. This is because there was none. At trial, Appellants were able to mount a fully realized defense, including presentation of their own expert witnesses to rebut fully Dr. Charash's theory. Moreover, because Dr. Charash's deposition testimony was replayed at trial, the interrogation of Appellants' own experts could be specifically programmed to respond to questions raised in the taped examination; Appellants were, at no point, faced with unexpected or unforeseen information at trial. Indeed, they do not claim to have been unprepared, even pre-trial, to counter Dr. Charash's deposition testimony through cross examination. Thus, we find no violation of the discovery rules.

¶ 34 Judgment affirmed.

4. Pitocin is a synthetic form of the medication oxytocin, used to induce and augment labor.