DeFrancesco v. Lehigh Valley Hospital-Muhlenberg, Inc.

*Charles L. Becker*, for plaintiffs.
*Howard S. Stevens* and *Laurie B. Shannon*, for defendants.

JOHNSON, *J.*, January 31, 2014—

## ORDER

And now, this 31st of January, 2014, upon consideration of plaintiffs' motion for post-trial relief filed October 7, 2013, the responses of all defendants, and after oral argument;

It is hereby ordered that the post-trial relief is denied and the verdict stands for the reasons set forth in the accompanying memorandum opinion.

## I. INTRODUCTION

Before the court for consideration is plaintiffs' motion for post-trial relief filed on October 7, 2013. Said motion was timely filed following a ten (10) day jury trial in

which the jury returned a verdict in favor of the defendants and against the plaintiffs in no amount on September 27, 2013. This case dealt with plaintiffs' claim for medical malpractice against the defendants which arose from the death of their son, Devin Weiss ("Devin"). In their request for post-trial relief, the plaintiffs raise four (4) issues which will be discussed individually.

The applicable standard is whether the judicial process resulted in a serious injustice, as where there has been an error of law or where the verdict is against the clear weight of the evidence. *Austin v. Ridge*, 435 Pa. 1,255 A.2d 123, 125 (1969). In determining whether a new trial is merited, the court must first determine whether an error occurred and, if an error occurred, whether that error is a sufficient basis for a new trial. *Harman ex. rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000). "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she suffered prejudice from the mistake." *Id.* Measuring this case against these high standards, the court finds that a new trial is not merited in this matter.

1. Must the court strike for cause a potential juror who is a current client of the law firm that is representing one of the defendants?

In this case, counsel elected to conduct jury *voir dire* off the record and without the presence of the court and rourt reporter. When disagreements would arise about a potential juror's ability to be fair and impartial, counsel would advise the court of the issue and the court would conduct questioning of the juror and entertain argument from counsel as to that juror. On the first day of jury selection, counsel brought two issues to the court for ruling

in the late afternoon. (N.T., 8/16/13 at p. 69). One of those issues dealt with a juror's relationship with a law firm that represents the defendants in this case and has now been raised as an issue for post-trial relief. A motion to strike for cause should be granted when: 1) "the prospective juror has such a close relationship, familial, financial, or situational, with parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice," or 2) the juror demonstrates a likelihood of prejudice through his conduct or responses to questioning. *McHugh v. Proctor Gamble Paper Products Company*, 776 A.2d 266, 270 (Pa. Super. 2001).

While the appellate courts of Pennsylvania have never addressed the issue of a potential juror having a current relationship with a law firm that employs counsel in the matter at bar, the courts have addressed the issue of a former attorney-client relationship. *See Linsenmeyer v. Straits*, 166 A.2d 18,23 (Pa. 1960). The Supreme Court of Pennsylvania found in the Linsenmeyer case that there was no reason in the record to justify a belief that the prospective juror would be unable to fairly decide the case. The court also added that the trial judge was in a "much better position to evaluate the situation" because the trial court saw the prospective jurors and heard their responses to the *voir dire* questioning. *Id.* In the case at bar, the plaintiffs made a motion to strike for cause juror number 18, Mr. Cougle ("Cougle"). ("N.T., 8/16/13 at p. 69). The reason stated by the plaintiffs was that Cougle was currently represented by the Gross McGinley law firm, the same firm at which defense attorney Stevens is a partner. *Id.* at pp. 69-70. The court then questioned Cougle to determine the facts surrounding his representation by the Gross McGinley firm. Cougle was being represented by attorney Tom Capehart in an estate matter. *Id.* at pp.

70-78. Attorney Capehart practices out of the Emmaus office of Gross McGinley while attorney Stevens practices out of the firm's Allentown office. *Id.* at p. 70. Attorney Stevens practices in the area of litigation, particularly medical malpractice, while attorney Capehart practices in the area of estates. *Id.* Attorney Stevens also made it clear to Cougle that he had nothing to do with his estate and that attorney Capehart had nothing to do with this litigation. *Id.* When questioned, Cougle stated that he had never heard of attorney Stevens, nor had he ever noticed his name on the firm's letterhead. *Id.* at pp. 75-77. The court determined that Cougle should not be stricken for cause for having a "close relationship with counsel" because he was unfamiliar with counsel in this case and only had a relationship with another attorney of Gross McGinley in a wholly unrelated issue. There is no case law that would support the conclusion that this is a technical conflict and, therefore, the court evaluated Cougle in the same manner used, and approved by the Supreme Court, in the *Linsenmeyer* case. Cougle showed absolutely no signs of bias or prejudice. Based on his demeanor and responses, the court was able to determine that Cougle did not present a risk of prejudice and should not be stricken. The court was in the best position to make that determination under the manner addressed in the *Linsenmeyer* case and this ruling is consistent with Pennsylvania law.

The plaintiffs now contend that this should be a technical conflict regardless of Cougle's answers or demeanor. This position is inconsistent with the plaintiffs' position at the time of their objection which was based on the likelihood of prejudice reason to strike instead of the close relationship reason to strike under *McHugh*. This appears to constitute a waiver of this issue under Pennsylvania Rule of Civil Procedure 227.1(b)(2).

However, the court will review this issue on its merits. Plaintiffs contend that Cougle should have been stricken for cause for having "such a close relationship, familial, financial, or situational, with parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice." *McHugh v. Proctor Gamble Paper Products Company*, 776 A.2d 266, 270 (Pa. Super. 2001).

Plaintiffs have acknowledged there is no Pennsylvania case law to support their position, however, they cite to several other states dealing with a similar issue. These cases all have crucial facts that distinguish them from the case at bar. *O'Dell v. Miller*, 565 S.E.2d 407 (W.Va. 2002), is a medical malpractice case where the potential juror had a relationship with the law firm representing the defendant doctor, much like the facts here. But, in addition, the potential juror was also a patient of the doctor being sued. In that case, the potential juror had a close relationship with a party in the case, which is not present in the case at bar. In *Cantrell v. Crews*, 523 S.E.2d 502 (Va. 2000), the court held that a juror should have been stricken for cause because that juror was a current client of the law firm representing the plaintiff. *Cantrell* is distinguishable because, in that case, the juror was being represented in a motor vehicle accident case which was the exact same type of case for which he was to serve on the jury. Again, in the case at bar, the potential juror was represented by an unrelated attorney, practicing out of a different office, in an estate matter, and was in the jury pool for a medical malpractice action. In *Reef-Conlin's Inc. v. Fireman's Fund Ins. Co.*, 45 P.3d 863 (Mont. 2002), the prospective juror was the president of a bank that had a debtor-creditor relationship with one of the parties and was also responsible for selecting counsel for the business. This combination showed bias towards the attorney because, in

order to hire him to represent the company, the president must have thought favorably of him. The other cases cited by the plaintiff are either unpublished or go to show that the court has discretion to strike a juror if an attorney client relationship exists.

In conclusion, the plaintiffs' request that Cougle be stricken for cause for the technical reason of an attorney-client relationship with defense counsel's law firm is not supported by Pennsylvania law. In addition, to declare all the clients of a firm with dozens of attorneys in multiple cities automatically stricken is overbroad. The court properly examined and observed Cougle, looked at the facts in this case and established that the type of relationship that existed here did not create any risk of bias. This is soundly within the court's discretion as it is in the best position to weigh these issues.

2. Did the court abuse its discretion in restricting the questions plaintiffs' counsel could ask relating to Dr. Pettine's failure to document?

In ruling on defendant's motion to preclude expert testimony regarding Dr. Pettine's documentation, the court found that there is no cause of action in Pennsylvania for a doctor's failure to document and, therefore, the court struck the phrase "and accurately document" from plaintiffs' expert, Dr. Cusick's, report. This issue is based on an evidentiary ruling which is within the discretion of the court and a new trial will only be granted where there is gross abuse of discretion or error of law. *Jacobs v. Chatwani*, 922 A.2d 950, 966 (Pa. Super. 2007) citing *Simmons v. Cobb*, 906 A.2d 582, 584 (Pa. Super. 2006). Notwithstanding that, initially at the trial, plaintiffs' counsel speared to be attempting to advance and argument that the defendants were negligent for their failure to

properly document. Plaintiffs' counsel ultimately agreed that Pennsylvania does not recognize a cause of action for negligent documentation and that plaintiff did not attempt to plead such a claim. (N.T. 9/17/13 p. 52). The plaintiffs again acknowledged this during the argument held on post-trial relief. As this was not a cause of action, the court held that plaintiffs were precluded from eliciting testimony about documentation which could lead to a conclusion that the documentation was negligent. In this case, Dr. Pettine's records were not used by any other doctor prior to the decedent's death and, therefore, the documentation could not have been the cause of any injury sustained. The court found it appropriate to limit the expert opinion and questions by plaintiffs' counsel to the expert, so plaintiff's counsel could not argue, or suggest in the way he presented the evidence, that the defendants were negligent on a theory of failure to properly document.

In their brief, the plaintiffs substantially overstate the breadth of the court's ruling. The plaintiffs' memorandum, at p. 13, states "After oral argument, the court granted Dr. Pettine's motion and precluded any testimony regarding Dr. Pettine's failure of documentation." This representation completely mischaracterizes the court's ruling, which was explained and clarified by the court at length from p. 68 to page 79 of the notes of testimony of September 17, 2013 and continued through page 7 of the notes of testimony for the following day. In this explanation, the court went so far as to discuss hypothetical questions which plaintiffs' counsel might ask. (N.T. 9/17/13 at p. 74). The court took pains to clarify that the documentation could be used to impeach Dr. Pettine's credibility, but that an expert cannot impeach credibility and, therefore, the expert could only state inconsistencies between the doctor's notes and his deposition and compare that to what the expert was

taught. *Id.* at pp. 72-79. The gist of this ruling was clear: the plaintiffs could challenge Dr. Pettine's credibility through inconsistencies among his notes, deposition and trial testimony. Plaintiffs' counsel asked his expert several questions about whether various things appeared in the chart. (N.T. 9/24/13 at pp. 182, 186, 188, 189, 190, 191, 193, 251, 252, 253). Based on this extensive questioning, it is hard to imagine how the plaintiffs now argue that they were not able to use the lack of documentation to attack Dr. Pettine's credibility to such an extent that it harmed their case.

Treatment of the issue of documentation in this manner is common and occurs in virtually every medical malpractice action and every other lawyer has had no trouble effectively handling this without creating the issue argued here. The inability of plaintiffs' counsel to appreciate the differences and subtleties of the issues just discussed and understand this ruling or to tailor his questions to keep them from violating this ruling does not make the ruling any less valid. Therefore, the court did not abuse its discretion and actually made the only proper ruling under the rules of evidence by precluding expert testimony which could only be used to infer a cause of action that all parties agree does not exist.

3. Did the court abuse its discretion by not allowing the plaintiffs to impeach the defendants with a chapter of book authored by Dr. Bavaria, which he declared to be authoritative?

The court found that Dr. Bavaria, a cardiothoracic ("CT") surgeon, could not declare a chapter he wrote in *Mastery of Cardiothoracic Surgery* authoritative for purposes of the overcoming a hearsay objection. The court came to this conclusion for two reasons.

The first reason is that there was a stipulation among counsel that CT surgeons would not testify to standard of care because the doctors being sued in this case were an emergency room physician and an internal medicine doctor. Plaintiffs' counsel stated the parameters of this agreement including that CT surgeons "...will not be saying that the ER physicians or the family practice internal medicine doctor violated or did not violate the standard." Deposition of Dr. Bavaria, dated 9/15/13, at p. 6 (conducted before trial by video tape). The chapter of the book which Dr. Bavaria authored was "Chapter 56; Aortic Dissection." This chapter dealt with the diagnosis of aortic dissection. The court precluded the use of this chapter to cross Dr. Bavaria, explaining that its use was offering standard of care testimony. In addition, the use of this chapter to cross examine the defendants in this case would effectively be using Dr. Bavaria to testify to standard of care because he wrote the chapter and because diagnosis of aortic dissection was the main issue in this case. Therefore, use of this chapter would violate the stipulation and should not be allowed.

The second reason is based on the application of Pennsylvania law to a learned treatise. Pennsylvania does not recognize a hearsay exception for a learned treatise. Pennsylvania Rules of Evidence 803(18) (Not Adopted). However, it is well-settled in case law that a learned treatise which is declared authoritative by an expert in that field may be used to impeach that expert or other witnesses in the field. *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436 (Pa. Super. 1987). A learned treatise is any textbook, published work, or periodical that has been accepted as authoritative or as reliable authority by members of a specific professional community. *Aldridge v. Edmunds*, 750 A.2d 292, 296 (Pa. 2000). Plaintiffs contend that

it would not violate the stipulation to have Dr. Bavaria testify that this chapter was authoritative and to then cross examine the defendants with this chapter. To determine this, the court must determine whether a CT surgeon is a member of the same specific "professional community" as an emergency room physician or internal medicine doctor under *Aldridge*. Plaintiffs contend that the professional community is defined in this instance by the topic of the chapter "aortic dissection," arguing that more than one area of practice deals with aortic dissection. Deposition of Dr. Bavaria, dated 9/15/13, at p. 142.

Following *Aldridge*, the court disagrees with plaintiffs that the issue is whether more than one area of practice deals with aortic dissection. While both a CT surgeon and an emergency room physician may be expected to diagnose aortic dissection, the standards and factors each doctor uses may be completely different. It would be against the spirit of the rules of evidence as to learned treatises to hold an emergency room physician to a higher standard of diagnosis contained in a book written specifically for CT surgeons.

To determine the answer, the court looked at two things. First, the court found it logical in a medical malpractice action to look for guidance to MCARE's requirements for expert qualifications, which require an expert testifying about standard of care, failure to diagnose aortic dissection in this case, to be in a substantially similar field of medicine. 40 P.S. 1303.512. The court was clear in its explanation that it was using the MCARE qualifications as a comparison to the *Aldridge* requirements and as a reference point and for guidance only, not to superimpose the 512 requirements over the rules of evidence. (N.T. 9/18/13 at pp. 166-167). This guidance was completely

logical and within the discretion of the court.

Second, another factor that persuaded the court to disallow the use of this text to impeach the defendants was the preface to the book, which reads in part:

When we set out to produce the first edition of the *Mastery* we were uncertain of the reception that it would receive from the *cardiothoracic community*...

The book should prove extremely useful for the *trainee in cardiothoracic surgery as well as for the experienced practitioner who may want to look up an infrequently performed procedure* as a brief refresher...

We feel that this book still serves as an excellent complement to the major textbooks in the field especially with regard to the *performance of the actual surgical procedure*...

We need to find creative ways to continue to attract the most talented people to this great *specialty* of ours. It is our hope that the second edition of *Mastery of Cardiothoracic Surgery* will provide a concise, yet broad look at the specialty for the *individual consider the field as his or her life's work.*

*Mastery of Cardiothoracic Surgery* Preface (emphasis added).

The court clearly determined that, based on *Aldridge*, this text could not be found authoritative for the specific communities in which the defendants were practicing, of emergency room medicine, where Dr. Krieg was board certified and was practicing, or internal medicine, where Dr. Pettine was board certified and was practicing. Therefore, the court did not abuse its discretion in barring the plaintiffs from impeaching the defendants with this

text which both violated the stipulation of the parties and was not authoritative in the areas of practice of the defendant physicians.

4. Did the court abuse its discretion limiting the plaintiff's expert from testifying beyond the fair scope of his report?

The court precluded plaintiffs' expert, Dr. Gasirowski, from discussing certain symptoms of aortic dissection and gastroesophageal reflux disease ("GERD") which were not discussed in his expert report. Under Pennsylvania law, the direct testimony of an expert witness at trial may not go beyond the fair scope of his or her report or record. Pennsylvania Rule of Civil Procedure 4003.5(c). Here, the court examined Dr. Gasirowski's relatively brief three (3) page report. The report did discuss the symptoms with which the decedent presented, including chest pain going to his back, shortness of breath and nausea. Dr. Gasirowski's report p. 2. Dr. Gasirowski then drew the conclusion that these symptoms were consistent with aortic dissection and acute coronary syndrome. *Id.* He made no mention of the other symptoms that the decedent had or that a person with aortic dissection would have. The symptoms of aortic dissection the plaintiffs sought to introduce into evidence, which the defendants sought to preclude were 1) the existence of anxiety and/or apprehension; 2) sudden onset of chest pain; 3) the difference between the pulses in the arms and legs; and 4) blood pressure differences between the arms. The plaintiffs also sought to introduce into evidence, and the defendants also sought to preclude, symptoms for the diagnosis of GERD: 1) history of heartburn; 2) regurgitation reflux; 3) food intolerance; 4) esophageal spasms; and 5) use of antacids. The court found that plaintiffs were attempting at trial to add factors

that were not referenced in their expert's report and did not reasonably flow from that report and that, thus, the defendants had no notice that they would have to be prepared to defend on these points. Dr. Gasirowski drafted his report and made broad conclusions about the standard of care based on symptoms with which the patient presented, but did not list any reason or other symptoms showing this was insufficient. The entire focus of the expert report is on the patient's symptoms and the standard of care with regard to those symptoms. The defendants received no notice from plaintiff that this expert intended to opine as to other alleged symptoms of this condition and to permit him to do so in these circumstances would encourage experts to write short, broad reports so that they could later explain them in any way that fits their party's theory of the case. The court concludes that is not consistent with the rules of evidence and case law as to expert reports and the four corners of the report doctrine. The court allowed Dr. Gasirowski to testify in a manner consistent with his report which established his belief that the defendants' care fell below the professional standard of care. This does not constitute gross abuse of discretion which would merit a new trial.

## II. CONCLUSION

Pursuant to Pennsylvania case law, the court finds that no abuse of discretion or error of law occurred in jury selection or during the trial. The court's rulings were consistent with the law and those that were within the court's discretion were sound. The plaintiffs have failed to show that any improper ruling caused the type of prejudice that merits a new trial. Therefore, the plaintiffs' motion for post-trial relief is denied and the verdict stands in favor of the defendants in no amount.