**Hannon v. Temple Univ. of the Commonwealth System of Higher Education**

*David B. Rodden,* for appellees.

*Michael E. McGilvery, Brett Engelkraut, Neil C. Schur* and *James C. Schwartzman,* for appellants.

SNITE JR., *J.,* February 11, 2011—

## PROCEDURAL HISTORY

On September 24, 2006, Daniel Hannon went to the Temple School of Dentistry as part of his job as copy machine repairman. As Mr. Hannon left the building, he fell on the steps outside of the school and injured his neck.

On August 26, 2008, David Brian Rodden, Esquire, of the law firm Rodden & Rodden filed a complaint on behalf of Mr. Hannon and his wife, Michelle Hannon, (plaintiffs) against Temple University, Temple University Hospital, Inc., and Temple University School of Dentistry (defendants/appellants).

On September 8, 2008, Michael E. McGilvery, Esquire, of the law firm Young and McGilvery entered his appearance on behalf of defendants. Brett J. Engelkraut, Esquire, an associate at Young and McGilvery, was also assigned to this case.

In December of 2009, discovery was completed in accordance with the case management conference order set forth on December 9, 2008.

On February 16, 2010, a pre-trial conference was conducted in front of the Honorable Howland Abramson and this case was scheduled for jury selection on April 23, 2010 and for trial on April 26, 2010.

On April 19, 2010, Mr. McGilvery, by faxed letter, informed Judge Abramson that he began a trial in front of Judge DiNubile on this day and that he did not expect this trial to conclude until April 27, 2010. He requested to postpone trial in the instant case until April 28, 2010. Judge Abramson denied Mr. McGilvery's request for a continuance.[1]

On April 20, 2010, Mr. McGilvery informed this court, by faxed letter, of the scheduling conflict mentioned above and again requested that this case be postponed until April 28, 2010. I was unavailable to rule on this matter on April 20, 2010 due to a previously scheduled vacation. I was informed of this request by my staff and I relayed to the parties that I would rule on this matter on Monday, April 26, 2010, the scheduled trial date. I also informed the parties that jury selection would go forward as planned on Friday, April 23, 2010.[2]

On April 26, 2010, George W. Young, Esquire from the law firm of Young and McGilvery, appeared in court on behalf of Mr. McGilvery. Mr. Engelkraut was also present. On this day, Mr. Young withdrew Mr. McGilvery's request for a continuance and trial commenced with Mr. Young as lead counsel for the defendants.

---

[1] Judge Abramson, as the team leader, was responsible for ruling on requests for continuances up until the time of trial.

[2] I was in Spain, and did not return to the United States until Saturday, April 24, 2010.

On April 29, 2010, the jury returned a verdict for plaintiffs in the amount of $1,687,000.00.

On May 6, 2010, defendants filed post-trial motions. Plaintiffs filed a response on May 13, 2010.

On June 23, 2010, an order was issued granting plaintiffs delay damages in the amount of $41, 552.87.

The parties submitted briefs on the post-trial motions and I heard oral argument on the motions on October 26, 2010. By order dated November 3, 2010, I denied defendants' amended motion for post-trial relief.

On November 22, 2010, defendants (appellants) timely filed their notice of appeal.

On December 15, 2010, appellants were served with an order to file their statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925 (b).

On January 3, 2011, appellants timely filed their statement of matters complained of on appeal. Appellants are being represented on appeal by Neil C. Schur, Esquire, of the law firm Stevens & Lee.

## ISSUES ON APPEAL

Appellant frames the issues on appeal as follows:

a. The court abused its discretion by denying defendants' April 19, 2010, April 20, 2010 and April 26, 2010 requests for a two-day continuance of trial due to the unavailability of defendants' designated trial counsel, Michael E. McGilvery, Esquire, who was trying another case in this court, denying defendants

their right to select trial counsel and resulting in a fundamentally unfair trial and verdict.

b. The court abused its discretion by permitting plaintiffs' engineering expert, John Posusney, to offer testimony which was beyond the scope of his expert report.

c. The court abused its discretion by permitting plaintiffs' engineering expert, John Posusney, to testify to inadmissible hearsay regarding various standards and/or guidelines involving expansion joints and handrails.

d. The court abused its discretion by permitting plaintiffs' engineering expert to utilize demonstrative exhibits which were not produced to opposing counsel prior to trial.

e. The court abused its discretion by permitting plaintiffs' life-care planner to testify to information and/or statements elicited by her partner from plaintiff.

f. The court abused its discretion by precluding defendants' architectural expert from testifying to the cause of plaintiff Daniel Hannon's fall.

g. The court abused its discretion by limiting the testimony of defendants' architectural expert.

h. The court abused its discretion by permitting the jury to review a portion of plaintiffs' life-care planner's expert report and demonstrative exhibits during deliberation.

i. The court abused its discretion by denying

defendants' Motion for Non Suit.

## FACTUAL HISTORY

Viewing the evidence in the light most favorable to plaintiffs, as the verdict winners, the following facts were proven at trial:

On Thursday, September 14, 2006, Daniel Hannon went to Temple Dental School as part his job as a copy repairman for Corrigan Manning. (N.T. 4/27/10, p. 65-70) As he was leaving Temple, at approximately 1:30 p.m., Mr. Hannon fell on the stairs outside of the school. (N.T. 4/27/10, p. 65-72) As Mr. Hannon was preparing to descend the steps, his foot caught in an expansion joint and he tripped. (N.T. 4/27/10, p. 73-74) Mr. Hannon attempted to grasp the handrail, but he could not grip it and he fell down the stairs. (N.T. 4/27/10, p. 73)

Once Mr. Hannon landed at the bottom of the steps, he gathered some tools which had come out of his bag during the fall. (N.T. 4/27/10, p. 76) He looked up to see what had caused him to trip and he noticed the expansion joint. (N.T. 4/27/10, p. 76) He also examined the railing, but he could not see any reason why he had been unable to grip the railing in order to stop his fall. (N.T. 4/27/10, p. 76) Mr. Hannon was very shaken and embarrassed after his fall, and once he regained his composure, he immediately went to his van. (N.T. 4/27/10, p. 76)

After Mr. Hannon reached his van, he called his dispatcher and let her know that he fell, that he was starting to feel pain, and that he was not going to continue to work that day. (N.T. 4/27/10, p. 78)

Mr. Hannon next called his wife and told her that he

fallen at work and that he was going to end his work day early and return home. (N.T. 4/27/10, p. 79)

Mr. Hannon did not go into work the following day as scheduled, and because his neck pain was increasing, and because he was starting to feel pain in his arm, Mr. Hannon went to Frankford-Torresdale Hospital that following Monday. (N.T. 4/27/10, p. 79-80) Mr. Hannon underwent x-rays and was referred to a muscle, bone, and joint specialist. (N.T. 4/27/10, p. 80) Mr. Hannon followed up with the muscle, bone, and joint specialist a few days later and underwent an MRI on his neck. (N.T. 4/27/10, p. 81)

Mr. Hannon's doctor, Dr. Corcoran, reviewed the MRI results and determined that Mr. Hannon had two herniated discs in his neck. (N.T. 4/27/10 p. 82) Dr. Corcoran recommended that Mr. Hannon get epidural injections to treat his injury. (N.T. 4/27/10, p. 83) Mr. Hannon received three separate epidural injections but he did not feel any relief from his neck and arm pain. (N.T. 4/27/10, p. 86) At this point, Dr. Corcoran decided that Mr. Hannon might need surgery and referred Mr. Hannon to Dr. Salkin. (N.T. 4/27/2010, p. 87)

On December 13, 2006, Mr. Hannon underwent neck surgery. (N.T. 4/27/10, p. 91) This surgery gave Mr. Hannon feeling and strength back in his arm but did not take away all his pain. (N.T. 4/27/10. p. 98) Following his surgery, Mr. Hannon underwent physical therapy for a few months. (N.T. 4/27/10, p. 100) A year or so after the surgery, Dr. Salkin informed Mr. Hannon that he was restricted from lifting anything more than 10 pounds and that he should avoid bending, sitting, or standing for any

length of time. (N.T. 4/27/10, p. 101) Dr. Salkin also told Mr. Hannon that he would be unable to work at his job as a copy repairman. (N.T. 4/27/10, p. 101)

In the late summer of 2009, Mr. Hannon again went to see Dr. Salkin because the pain in his neck was increasing from the constant level that he had grown used to over the past few years. (N.T. 4/27/10, p. 102) Dr. Salkin recommended that Mr. Hannon undergo another set of epidural shots and Mr. Hannon complied. (N.T. 4/27/10, p. 102) Dr. Salkin explained to Mr. Hannon that he would never be able perform the kind of work that he had done before the accident. (N.T. 4/27/10) Additionally, Dr. Salkin informed Mr. Hannon that he may need more epidural shots in the future and possibly another surgery.

Mr. Hannon has found it painful to resume many of the activities he used to do before the accident, including fixing up his house, housework, playing the drums, trips to Cape May with his wife, and outings to the movies and concerts. (N.T. 4/27/10, p. 109-111) Mr. Hannon still has issues with pain and he uses ice packs and his wife rubs his neck and helps him apply a TENS Unit daily for relief. (N.T. 4/27/10, p. 112) He is still unable to work because he is limited to working for about four hours per day and he cannot sit or stand for more than 15 or 20 minutes at a time. (N.T. 4/27/10, p. 105)

## DISCUSSION

### 1. *Appellants' Continuance Request*

Appellants' assert that this court abused its discretion by denying Mr. McGilvery's continuance request and therefore they are entitled to a new trial.

In order for a new trial to be granted on the grounds that a judge improperly denied a request for a continuance, the reviewing court must conclude that the judge abused his discretion. *Nerkowski v. Yellow Cab*, 436 Pa. 306, 309, 259 A.2d 171, 173 (Pa. 1969). The reviewing court should consider the following four factors to determine if a judge abused his discretion: 1) prejudice to the opposing party because of the delay; 2) whether opposing counsel was willing to agree to a continuance; 3) the length of the delay; and 4) the complex nature of the case. *Papalia v. Montour Auto Serv. Co.*, 682 A.2d 343, 345 (Pa. Super. 1996).

As mentioned above, Mr. McGilvery began a trial in front of the Honorable Judge DiNubile on April 19, 2010. He anticipated that this case would not conclude until April 27, 2010. The instant case was scheduled for jury selection on April 23, 2010 and for trial on April 26, 2010. On April 20, 2010, Mr. McGilvery faxed a letter to both my chambers and Judge Abramson's chambers in which he requested that this case be postponed until April 28, 2010. I happened to be out of the country on vacation at the time this fax was received. My law clerk, Anna Schenker, Esquire, spoke with Judge Abramson's office and she was informed that Judge Abramson had denied Mr. McGilvery's continuance request. Judge Abramson also told Ms. Schenker, via his secretary, that he would leave it up to my discretion as to whether I would postpone the trial for few days to accommodate Mr. McGilvery's schedule. Ms. Schenker informed me, by telephone, of Mr. McGilvery's request and Judge Abramson's position on the matter, and I directed Ms. Schenker to inform Mr. McGilvery that I would rule on the issue on Monday, April

26, 2010. I also told Ms. Schenker to continue with jury selection on Friday, April 23, 2010.

On Monday, April 26, 2010, Mr. Young appeared in my courtroom in Mr. McGilvery's place. I permitted Mr. Young to argue as to why this case should be postponed in order for Mr. McGilvery to try the case. (N.T. 4/26/10, p. 4-17) During Mr. Young's argument he stated the following: "Again, I'm not - at this point I'm not asking the Trial court to overrule Judge Abramson...Judge Abramson denied it. I am at the court's discretion. If the court's pleasure is to go forward, we will do that." (N.T. 4/26/10, p. 17)

Leading up to this point in the discussion, I was contemplating whether or not I should permit this case to be postponed for a few days. I believed that while Judge Abramson had made a decision in this matter, he had left me some leeway to grant a postponement if I deemed it absolutely necessary. After hearing Mr. Young's statement, I was under the impression that he saw that I was struggling to make a decision, and he did not want to trouble me with this issue anymore. (N.T. 10/26/10, p. 14). I was somewhat relieved that he appeared to be willing to go forward as counsel and, at this point, we moved on to discuss trial issues. (N.T. 10/26/10, p. 14)

I did not abuse my discretion by failing to postpone this trial because I was of the understanding, from my discussion with Mr. Young, that he was essentially waiving the issue. Additionally, Judge Abramson did not abuse his discretion by denying Mr. McGilvery's continuance request.

As discussed, there are four factors that should be

considered to determine if a judge abused his discretion in not granting a continuance request. The first factor to be considered is the resulting prejudice that would be suffered by the opposing party if the case is delayed. Here, plaintiffs had subpoenaed witnesses and paid experts to be present on April 26, 2010 for the start of trial. The second factor is whether or not opposing counsel agreed to the continuance request. In the instant case, plaintiffs' counsel was very much opposed to continuing the case. Plaintiffs pointed out, during argument on appellants' post-trial motions, that this case was assigned a trial date four months in advance, and that this advance notice gave Mr. McGilvery plenty of time to find adequate coverage. (N.T. 10/26/10, p. 18) Additionally, this case was only given a date certain for trial as a courtesy to Mr. McGilvery because of his busy trial schedule. (N.T. 4/26/10, p. 12) The third factor to consider is the length of the delay that would be imposed by granting the continuance. While it appears that Mr. McGilvery was only requesting three days of additional time, the granting of this continuance would have had much larger ramifications. In the 2008 Day Forward Trial Program of the Philadelphia Court of Common Pleas, judges are assigned date certain cases to begin trial every Monday. This means that a jury has to be picked for that Monday's case on the previous Friday. If appellants' continuance was granted and trial was permitted to begin on Wednesday, April 28, 2010, the following week's date certain case would also have to be pushed back creating a domino effect in the system. The fourth and final factor to be considered is the complex nature of the case. This case was a trip and fall case, and as far as damages were concerned, Mr. Young, not Mr. McGilvery,

had the opportunity to cross-examine plaintiffs' medical expert at his deposition. (N.T. 4/26/10, p. 16)

From the record, it is evident that Mr. Young's statement to me waived appellants' continuance request. Additionally, it is clear after looking at all the factors relevant to continuing a case, Judge Abramson did not abuse his discretion in denying appellants' request for a continuance.

Finally, I would note that appellants have identified no prejudice beyond the fact that Mr. McGilvery, Mr. Young's partner, was the originally assigned attorney.

## 2. *Plaintiffs' Engineering Expert, John Posusney*

Appellants challenge this court's evidentiary rulings with respect to three aspects of Mr. Posusney's testimony. appellants claim Mr. Posusney was permitted to testify beyond the scope of his report, that a portion of his testimony was in inadmissible hearsay, and that he was permitted to use inadmissible demonstrative exhibits.

Pennsylvania law is well-settled in this area and appellate courts have consistently held that a trial court's evidentiary rulings will not be overturned unless the appellant can show that that the trial court abused its discretion. *Whitaker v. Frankford Hosp.*, 984 A.3d 512, 522 (Pa. Super. 2009).

### a. *Scope of Expert Report*

Appellants' contend that this court abused its discretion by permitting Mr. Posusney to testify beyond the scope of his expert report.

Generally, Pennsylvania courts have held that:

An expert's testimony on direct examination is to be limited to the fair scope of the expert's pre-trial report. In applying the fair scope rule, we focus on the word "fair." Departure from the expert's report becomes a concern if the trial testimony "would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response." Therefore, the opposing party must be prejudiced as result of the testimony going beyond the fair scope of the expert's report before admission of the testimony is considered reversible error. *Coffey v. Minwax Co.*, 264 A.2d 616, 621 (Pa. Super. 2000).

Appellants, in their post-trial motions, mention two instances in which they believe Mr. Posusney testified beyond the scope of his expert report. Appellants first take issue with the following exchange that took place during direct examination:

Mr. Rodden: Let me stop you. First of all, do engineers rely on codes?

Mr. Posusney: Yes.

Mr. Rodden: Is there a code concerning level walkways?

Mr. Young: Objection.

The Court: Overruled. Go ahead.

Mr. Posusney: There's a multitude of them.

Mr. Rodden: What is the law regarding having a level walkway?

Mr. Young: Objection. May I be heard at sidebar, sir?

The Court. No. Go ahead.

The Witness: Very simple. If you have a change in walking surface elevation of a quarter of an inch, you as the property owner have no duty really to rectify that. If it exceeds a quarter of an inch to a half inch, you then have a duty to perform corrective maintenance or remedial maintenance and either eliminate that change in elevation or provide a gradual transition to bridge it such that tripping accidents will not occur.

Mr. Young: Objection. Beyond the scope. Move for withdrawal of the jurors. It's beyond the scope. (N.T. 4/26/10, p. 156-157).

After this exchange, the jurors and Mr. Posusney were sent out of the room and argument was heard on appellants' objection. (N.T. 4/26/10, p. 157) I determined that plaintiffs' question, "What is the law regarding having a level walkway" was confusing and misleading, and Mr. Posusney's answer regarding the current Philadelphia Building Code was improper, and sustained appellants' objection.[3] Plaintiffs were also warned to keep questions within the confines of Mr. Posusney's expert report. (N.T. 4/26/10, p. 161) I then gave the jury the following curative instruction:

The Court: Let me just say one thing before we continue. I think one of the precise questions that was asked of Mr. Posusney was: What's the law concerning the rise

---

3. In hindsight I wish that I had permitted appellant to articulate his argument at side bar following his second objection. Nonetheless, I think I aptly dealt with this issue by giving a curative instruction to the jury.

between the two slabs?

We've talked that over, and I've told Mr. Posusney and the two attorneys that that's — I don't want that word being used "what is the law." When we talk about the law is, I will be telling you what the law is. We are going to be just a little more exact in our terms as to what a building code is, which is the law. And also other organizations that have standards as to what they believe good ideas are or aren't. It doesn't necessarily mean that it's the law, but as to whether something is safe or not, whether the defendant has breached a duty or not, these are areas that can be considered and we'll talk about that a little more. (N.T. 4/26/10, p. 169).

While it appears that Mr. Posusney testified slightly outside the scope of his report in this one instance, this problem was swiftly remedied by sustaining appellants' objection and giving a curative instruction to the jury. The jury was clearly told that they will get the law from the judge and therefore no prejudice was suffered by appellants.

Second, appellants' believe Mr. Posusney's testimony regarding an alternative, safer, handrail design and the costs associated with altering the existing Temple Dental School handrail was beyond the scope of his report. Contrary to appellants' claims, the measurements for safer handrails are discussed in Mr. Posusney's report in addition to a possible modification that could be made to make the current Temple Dental School handrail safer.[4] Mr. Posusney's expansion on these points at trial is within

---

4. See plaintiffs' exhibit P-21.

the fair scope of the report and appellants had adequate notice from Mr. Posusney's report to prepare a meaningful response.

b. *Hearsay*

Appellants assert that the sections of Mr. Posusney's testimony pertaining to standards and guidelines for expansion joints and handrails are inadmissible hearsay.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801. In general, hearsay is inadmissible with some exceptions. Pa.R.E. 803. Pennsylvania law does not recognize a hearsay exception for learned treaties. *Aldridge v. Edmunds*, 561 Pa. 323, 332, 750 A.2d 292, 297 (2000). However, Pennsylvania law does permit experts to rely on authoritative materials in their field when forming their opinions even though these materials are hearsay. *Id.* Furthermore, a trial court can permit an expert to explain the basis of his opinion on direct examination, and to a limited extent, allow that expert to mention specific authorities and, and, in appropriate circumstances, discuss their contents. *Id.*

In the instant case, Mr. Posusney relied on various industry standards in formulating his opinions. It was not an abuse of discretion for this court to permit Mr. Posusney to tell the jury that the basis for his opinions came from these authorities nor was it improper for Mr. Posusney to articulate some specifics from these guidelines to further explain his findings.

c. *Demonstrative Exhibits*

Appellants argue that this court erred in permitting Mr. Posusney to use demonstrative exhibits at trial because appellants' expert did not have the opportunity to examine these exhibits before trial.

Mr. Posusney prepared two models to use to explain handrail graspability to the jury. One of the models is a replica of the handrail located on the steps of the Temple Dental School at the time of Mr. Hannon's fall.[5] (N.T. 4/26/10, p. 178) The other model is an example of a handrail that would enable a pedestrian to get a "power grip"[6]. (N.T. 4/26/10, p. 178-180)[7]

In response to appellants' objection at trial, a discussion was held with the parties outside the presence of the jury on this issue. Plaintiffs stated that the model of the Temple Dental School handrail would be used for the limited purpose of confirming the measurements taken by Mr. Posusney, and to give the jury a better understanding of the dimensions of the handrail beyond what they could discern from a two-dimensional photograph. (N.T. 4/26/10, p. 166) Plaintiffs explained that the other model would be used to show the jury a safer alternative to the Temple Dental School handrail and to demonstrate the concept of graspability. (N.T. 4/26/10, p. 166-167)

Mr. Posusney made it clear that he was not going to say to the jury that appellants were under an obligation

---

5. See plaintiffs' exhibit P-21(g).

6. Mr. Posusney testified to the jury that power grip occurs when the thumb, forefinger, and middle finger can encircle the handrail and touch each other which allows for the grasper to get a strong hold on the handrail. (N.T. 4/26/10, p. 176).

7. See plaintiffs' exhibit P-21 (e).

to install a handrail similar to this second model. (N.T. 4/26/10, p. 168) At this point, I overruled appellants' objection and permitted these demonstrative exhibits to be used for the limited purposes articulated by plaintiffs and Mr. Posusney. (N.T. 4/26/10, p. 167)

Mr. Posusney testified, in front of the jury, that he made a model of the handrail at issue, and he went on to explain why this particular handrail is difficult to grasp. (N.T. 4/26/10, p. 177-178) Mr. Posusney further explained to the jury that safer handrail designs were possible using the second model. (N.T. 4/26/10, p. 179-182)

This court did not abuse its discretion by permitting Mr. Posusney to utilize these demonstrative blocks during his testimony to the jury. This court provided appellants with an opportunity to present these blocks to their expert before Mr. Posusney testified. Additionally, experts from both sides agreed that the measurements used to manufacture the mock Temple Dental School railing were correct. Mr. Posusney simply created a physical manifestation of the measurements agreed to by all parties. Finally, Mr. Posusney's safer mock handrail was simply a physical embodiment of measurements that, in his expert opinion, he finds to be necessary for a graspable handrail.

3. *Plaintiffs' Life Care Planner, Lorraine Buchanan.*

Appellants argue that this court abused its discretion by permitting plaintiffs' life care planner, Ms. Buchanan, to testify based on a report prepared by her business partner. Appellants' assert that Mr. Hannon's statements to this associate were inadmissible on hearsay grounds.

The interview at issue concerns responses given by

Mr. Hannon to questions asked to him by Ms. Buchanan's associate. The jury was told that Mr. Hannon met with Ms. Buchanan's associate and not Ms. Buchanan personally. (N.T.4/27/10, p. 43)

Here, it is clear this court did not abuse its discretion by permitting Ms. Buchanan to testify. It is obvious that Mr. Hannon's statements to Ms. Buchanan's associate were out-of-court statements made for the truth of the matter. However, in order to calculate damages, the information on which to base those damages can only come from Mr. Hannon, and then, based on this information, the expert can draft a life care report.

Furthermore, any hearsay elements were negated by that fact that Mr. Hannon was sitting in the courtroom during Ms. Buchanan's testimony. If the was an issue, Mr. Hannon could have been recalled to the stand and asked what he said to the life care planner. Ms. Buchanan could have listened and then been subsequently asked if this information is what she used to make up her expert report.

### 4. *Demonstrative Exhibits*

Appellants claim that this court abused its discretion by permitting the jury to see a chart presented during plaintiffs' life care planner's testimony and the wooden mock railing blocks during deliberations.

After deliberating for a short time, the jury sent a question to this court and the attorneys. They asked to see a copy Mr. Guziewicz's report (appellants' witness), Ms. Buchanan's life care plan, and the wooden handrail cutouts. (N.T. 4/29/10, p. 93)

I permitted Mr. Guziewicz's report, which consisted of a single page that was read to the jury word for word and put up on the projector screen in its entirety, to go out to the jury over plaintiffs' objection. I also allowed the wooden blocks to go out to the jury based on the fact that they already had the opportunity to view the blocks during Mr. Posusney's testimony. (N.T. 4/29/10, p. 96)

With regard to Ms. Buchanan's report, I told the jury that the entire report would not be given to them because there were certain items in that report that were not brought out during her testimony. (N.T. 4/29/10, p. 98). Additionally, I informed them that they could still ask questions about Ms. Buchanan's testimony and what she said about things in her report. (N.T. 4/29/10, p. 98)

After further deliberations, the jury asked to see Ms. Buchanan's itemized lifetime care costs chart that had been shown on the screen during her testimony. (N.T. 4/29/10, p. 102) I informed the parties that I would send this sheet out to jury because they had seen the document in its entirety, and giving this page to the jury was consistent with what I had done with appellants' expert report. (N.T. 4/29/10, p. 102)

This court did not abuse its discretion by permitting the itemized sheet displayed to the jury during Ms. Buchanan's testimony or the wooden cutouts used during Mr. Posusney's testimony to be sent out to the jury during deliberations. I was consistent in my dealings with both parties by permitting only those portions of expert reports to go to the jury that were shown to the jury in entirety during the trial. Likewise, the blocks had already been

viewed by the jury during the trial. By having these exhibits during deliberations, the jury was not privy to anything beyond w hat was already presented to them at trial.

5. *Testimony of Appellant's Architectural Expert, Walter Green*

Appellant claims that this court abused its discretion by precluding Mr. Green from testifying about the cause of Mr. Hannon's fall. The following exchange took place during Mr. Green's direct examination.

Mr. Young: In your opinion, does this configuration create any sort of a dangerous trip hazard?

Mr. Green: No, it does not, and it is of quite customary condition.

Mr. Young: In your opinion, from the items that you reviewed, did Mr. Hannon trip over anything on December 14th, 2006?

Mr. Rodden: Objection.

The Court: I'm going to sustain it. (N.T. 4/28/10, p. 122-123).

After plaintiffs' objection was sustained, Mr. Young did not follow up with additional questions on this issue. At a hearing to argue post-trial motions, Mr. Engelkraut explained that Mr. Young wanted to elicit from Mr. Green, that, in his expert opinion it was much more likely that Mr. Hannon slipped rather than tripped. (N.T. 4/26/10, p. 41). Mr. Green wanted to inform the jury that he based this opinion on his belief that there was no real tripping hazard, and on the fact that Mr. Hannon made statements

to medical providers in which he used the term "slip" instead of "trip."[8] (N.T. 4/26/10, p. 41).

This court did not abuse its discretion by sustaining plaintiffs' objection. It was not appropriate for Mr. Green, as an architectural expert, to make logical deductions about evidence presented at trial. This is the role of argument by the attorneys and consideration by the jury. Here, we had experts on each side of the case with differing opinions. appellants' expert claimed there was a tripping hazard but also wanted to go further and discuss the fact that Mr. Hannon may have told others that he slipped rather than tripped. It is the job of jury, if they see fit, to draw certain conclusions from evidence. It was not within Mr. Green's role, as an expert, to make these types of conclusions for the jury.

### 6. *Appellants' Request for a Nonsuit*

Appellant opines that this court abused its discretion by denying appellants' request for a nonsuit.

Under the Pennsylvania Rules of Civil Procedure, "the court, on oral motion of the defendant, may enter a nonsuit on any and all causes of action if, at the close of plaintiff's case on liability, the plaintiff has failed to establish a right to relief." Pa. R.C.P. 230.1.

After the close of plaintiffs' evidence, appellants made a motion for non suit at sidebar. (N.T. 4/28/10, p. 26) The basis of this motion was that Mr. Hannon had descended

---

8. These statements made by Mr. Hannon in which he used the word "slip" and not "trip" were admitted during the course of the trial. (N.T. 10/26/10, p. 38)

the steps at the Temple Dental School 12-15 times before the incident at issue, and because of this fact, he should have been aware of the danger, and therefore he was contributorily negligent and barred from recovering. (N.T. 4/28/10, p. 60) I denied this appellants' motion. (N.T. 4/28/10, p. 60)

The law in Pennsylvania is as follows with regard to contributory negligence:

> In all actions brought to recover damages for negligence resulting in death or injury to a person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar recovery by the plaintiff...where such negligence was not greater than the casual negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff. 42 Pa.C.S. §7102.

Here, the law of comparative negligence, detailed above and given to the jury, addressed the issue of Mr. Hannon's own negligence. The jury was free to conclude that Mr. Hannon was more than 50 percent contributorily negligent, and if they had come to such a conclusion, he would have recovered nothing from appellants.

## CONCLUSION

This court did not abuse its discretion by deciding not grant appellants' a continuance. Judge Abramson evaluated many factors including the advance notice that appellants were given of the trial date, the costs to plaintiffs, and the

domino effect that continuing the case would have on the 2008 Day Forward Program, and he ultimately concluded that the case should go forward as scheduled. Furthermore, appellants essentially waived the issue in front of this court on April 26, 2010.

This court did not abuse its discretion with regard to evidentiary rulings on the testimony given by Mr. Posusney. Mr. Posusney's brief statement outside the scope of his expert report was swiftly handled with a curative instruction to the jury. The guidelines and standards mentioned by Mr. Posusney during his testimony were not inadmissible, as experts are allowed to inform the jury about how they come to form their opinions. The demonstrative wooden blocks used by Mr. Posusney to show measurements and explain engineering concepts to the jury were admissible as they conformed to measurements agreed upon by all parties and appellants' expert was given the opportunity review these exhibits before they were shown to the jury.

This court did not abuse its discretion by permitting plaintiffs' life care planner, Ms. Buchanan, from testifying. Any hearsay elements were negated by the fact that Mr. Hannon was present in the courtroom and could be questioned about any statements that he made to Ms. Buchanan's business partner.

This court did not abuse its discretion by permitting demonstrative exhibits that had been shown to the jury in their entirety at trial to go out to the jury during deliberations. These exhibits had already seen by the jury and there was no resulting prejudice from giving them to the jury during deliberations.

This court did not abuse its discretion by sustaining plaintiffs' objection to Mr. Green's testimony as to conclusions based on the evidence. This the type of reasoning that should be left to the jury.

This court did not err by denying appellants' request for a nonsuit. The law of comparative negligence aptly dealt with the possibility that Mr. Hannon was contributorily negligent.

Accordingly, this appeal should be denied.