J-A30008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: WILLIAM G. KAMMERER T/U/W FBO JEANNE KAMMERER STEFL CONSOLIDATED WITH SUSAN J. KAMMERER, MELINDA J. MCGUIGAN, AND HARRY S. KAMMERER, EACH INDIVIDUALLY AND AS A SHAREHOLDER OF CHARTIERS LAND COMPANY AND ON BEHALF OF CHARTIERS LAND COMPANY | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br>No. 1627 WDA 2017 |
| v. | : : : : | |
| WILLIAM G. KAMMERER, JR. INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS AN OFFICER AND DIRECTOR OF CHARTIERS LAND COMPANY AND CHARTIERS LAND COMPANY, A PENNSYLVANIA CORPORATION AND ROBIN KAMMERER, WILLIAM G. KAMMERER, III, ADRIAN J. KAMMERER, LINDSAY J. MOORE, SAM COSTANZO, ARLENE R. KAUFMAN, THE ESTATE OF ROBERT B. MCKINLEY, VICTORIA MINELLA, MARY KAY SCHMIDT, THE ESTATE OF C.A. LAUER, THE ESTATE OF GEORGE STEVENS, AND THE ESTATE OF EDWARD L. BAYSEK | : : : : : : : : : : : : : : : : : : | |
| APPEAL OF: WILLIAM G. KAMMERER, JR., CHARTIERS LAND COMPANY, ROBIN KAMMERER, WILLIAM G. KAMMERER, III, ADRIAN J. KAMMERER, AND LINDSAY J. MOORE | : : : : : : | |

Appeal from the Order Entered October 6, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  02-80-3777

| | |
|---|---|
| IN RE: WILLIAM G. KAMMERER T/U/W FBO JEANNE KAMMERER STEFL CONSOLIDATED WITH SUSAN J. KAMMERER, MELINDA J. MCGUIGAN, AND HARRY S. KAMMERER, EACH INDIVIDUALLY AND AS A SHAREHOLDER OF CHARTIERS LAND COMPANY AND ON BEHALF OF CHARTIERS LAND COMPANY : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| : : : : : : : | No. 1692 WDA 2017 |
| v. : : : : | |
| WILLIAM G. KAMMERER, JR., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS AN OFFICER AND DIRECTOR OF CHARTIERS LAND COMPANY; AND CHARTIERS LAND COMPANY, A PENNSYLVANIA CORPORATION. : : : : : : : : : : | |
| v. : : : : | |
| ROBIN KAMMERER; WILLIAM G.KAMMERER, III; ADRIAN J. KAMMERER; LINDSAY J. MOORE; SAM COSTANZO; DENNIS E. KAUFMAN, PERSONAL REPRESENTATIVE OF THE ESTATE OF ARLENE R. KAUFMAN; PNC BANK, N.A., AS TRUSTEE OF THE MCKINLEY TRUST PURSUANT TO PARAGRAGH SECOND OF THE LAST WILL AND TESTAMENT OF ROBERT B. MCKINLEY; DAVID R. BAYSEK; MARY ANN HEID; EDWARD L. BAYSEK, JR., MELLON BANK, N.A., TRUSTEE FOR THE "FUND B" DAVID R. BAYSEK TRUST CREATED UNDER PARAGRAPH FOURTH OF THE LAST WILL AND : : : : : : : : : : : : : : : : : : : | |

- 2 -

TESTAMENT OF EDWARD L. BAYSEK; :
MELLON BANK, N.A., TRUSTEE FOR :
THE "FUND B" MARY ANN HEID :
TRUST CREATED UNDER PARAGRAPH :
FOURTH OF THE LAST WILL AND :
TESTAMENT OF EDWARD L. BAYSEK, :
JR., TRUST CREATED UNDER TRUST :
CREATED UNDER PARAGRAPH :
FOURTH OF THE LAST WILL AND :
TESTAMENT OF EDWARD L. BAYSEK; :
RICCI A. MINELLA, EXECUTOR OF :
THE ESTATE OF VICTORIA T. :
MINELLA; MARK KAY SCHMIDT; :
GEORGE LAUER, AS SUCESSOR IN :
INTEREST, AND ANY OTHER :
SUCCESSOR IN THE INTEREST TO :
THE ESTATE OF C.A. LAUER, AND :
CARROLL STEVENS ADAMS, AS :
SUCCESSOR IN THE INTEREST TO :
GEORGE STEVENS :
:
:
:
APPEAL OF: SUSAN J. KAMMERER, :
MELINDA J. MCGUIGAN AND HARRY :
S. KAMMERER

Appeal from the Order Entered October 6, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): 02-80-3777

BEFORE:   SHOGAN, J., KUNSELMAN, J., and STRASSBURGER* J.

MEMORANDUM BY SHOGAN, J.:                    **FILED MAY 1, 2019**

In these consolidated actions, siblings Susan Kammerer, Melinda J.

McGuigan, Harry Kammerer (collectively "Shareholders"), and William

Kammerer, Jr. ("William"), individually and as an officer and director of the

_____

* Retired Senior Judge assigned to the Superior Court.

- 3 -

privately held corporation known as Chartiers Land Company ("CLC"), cross-appeal the order entered by the Court of Common Pleas of Allegheny County orphans' court on October 6, 2017.[1]  Upon review, we affirm in part, reverse in part, and remand.

This appeal stems from Shareholders filing two actions, one in the Allegheny County Court of Common Pleas civil division on January 16, 2016, at docket number 15-23266 ("declaratory judgment action"), and one in the Allegheny County Court of Common Pleas orphans' court division on June 16, 2016, at docket number 02-80-3777.  The civil complaint set forth a count for declaratory judgment and a count for breach of fiduciary duty,[2]  naming CLC and William, individually and as an officer and director of CLC.  Shareholders averred that William engaged in three stock transfers, the Lauer Transaction in 1980, the Stevens Transaction in 1988, and the Baysek Transaction in 1989

_____

[1]  Dennis E. Kaufman, in his capacity as Executor of the Estate of Arlene R. Kaufman (collectively, the "Estate"), filed an Application to Discontinue as to Less Than All Parties in this Court on June 4, 2018.  This Court denied the application without prejudice to the Estate's right to seek relief from the assigned panel.  Upon panel assignment, the Estate filed a Second Application to Discontinue as to Less Than All Parties on November 20, 2018 ("Application for Relief").  According to the Estate, it was identified as a potentially interested party in the declaratory judgment action because it was a shareholder of CLC.  The Estate sold its remaining interest in CLC in December of 2017 and March of 2018.  The Estate no longer has an interest in CLC and, therefore, should be dismissed from this matter.  Shareholders agree that the Estate should be dismissed.  Accordingly, we GRANT the Application for Relief.

[2]  Complaint, 1/16/16, at Counts I and II.

J-A30008-18

(collectively, the "Stock Transfers"), and exercised stock options, all in violation of Article XI of CLC's corporate by-laws ("Article XI").[3]

In their orphans' court complaint, Shareholders challenged the first and final account ("the Account") submitted on behalf of a trust ("Trust B") established by William G. Kammerer, Sr., the sibling parties' father, for the

---

[3] Article XI of the CLC by-laws provides a right of first refusal:

> Transfers of common stock shall be in person or by power of attorney on the books of the Corporation surrender of certificates, and shall be subject to the following restrictions:
>
> (a)   The party desiring to dispose of his stock must first offer it for sale to the Corporation at the proposed bona fide sale or market price to the Corporation in writing.  If the Corporation does not purchase such stock or any part thereof at the proposed sale price within thirty (30) calendar days after receiving notice of the sale, notice in writing of such sale shall be given by the Corporation forthwith to each of the other shareholders who shall then have the right to purchase said stock in proportion to their holdings in the Corporation, exclusive of the number of shares owned by the shareholder who is offered said stock for sale.  Said shareholder shall submit an offer in writing to the Corporation for said proportional shares or any part thereof within thirty (30) days after receiving notice in writing.
>
> In the event that neither the Corporation nor the other shareholders should make an offer in writing to purchase said stock within sixty (60) days of receiving notice in writing of the proposed sale, then such stock may be sold without any limitation as provided by the terms of this By-Law.
>
> The Corporation and shareholders may waive the provisions of the By-Law in writing.

Complaint, 1/16/16, at Exhibit 1.

benefit of his wife and the sibling parties' mother, Jeanne Kammerer Stefl ("Mother"). Among the Trust B assets to be distributed upon Mother's death were 5,020 shares of CLC stock. Mother died on December 11, 2013. Shareholders averred that, at the time of Mother's death, the outstanding CLC shares were undervalued at $167 per share because, according to the Account, the number of outstanding CLC shares at Mother's death was 18,305, when it should not have been more than 10,805. Shareholders further averred that the disparity in number was the result of William acquiring 7,500 shares of Treasury Stock[4] in violation of CLC's corporate by-laws. William acquired the Treasury Stock shares by exercising stock options granted to him by the CLC board of directors at a special meeting on February 3, 1995 (the "Stock Options"). The Stock Options allowed William to pay $5.00 per share for 1,500 shares annually for five years. Shareholders argued that the Stock Options should be deemed void and William should repay the $251,625 in dividends paid on the Treasury Stock shares.

The cases were consolidated on the orphans' court docket. The orphans' court allowed additional discovery to identify and join parties deemed to be indispensable to the declaratory judgment action. Such parties included William's wife and children, who had acquired CLC shares.

---

[4] CLC treasury stock is "[i]ssued shares of corporate stock that are not outstanding and held by the company, that have been repurchased. Or either not -- they could be not sold. They could be issued, but unsold. It would be the same thing." N.T. (William Deposition II), 1/10/17, at 14.

The orphans' court held an evidentiary hearing on August 29 and 30, 2017, and thereafter accepted proposed findings of fact and conclusions of law, which the parties filed on September 7, 2017. The orphans' court entered an order on October 6, 2017, declaring: (1) the Stock Transfers were void because they violated Article XI; (2) the Stock Options were void because they violated Article XI; (3) William's transfers of shares to his wife and children were void because they violated Article XI; and (4) William breached his fiduciary duty to the Shareholders. The orphans' court entered judgment against William for $44,319.50, which was the amount of dividends paid to William from the Stock Transfers. William and CLC appealed. Shareholders cross-appealed.[5] All parties and the orphans' court complied with Pa.R.A.P. 1925.

Our standard of review from a final order of the orphans' court is deferential:

> We accord the findings of the Orphans' Court, sitting without a jury, the same weight and effect as the verdict of a jury; we will

---

[5] We note that the parties timely filed their notices of appeal from the October 6, 2017 order. William and CLC timely appealed under Pa.R.A.P. 311(a)(8) and Pa.R.A.P. 342(a)(6) on October 30, 2017, less than thirty days after the orphans' court's determination that the Stock Transfers and Stock Options were void. *See* Pa.R.A.P. 903(a) (except in circumstances not relevant here, "the notice of appeal . . . shall be filed within 30 days after the entry of the order from which the appeal is taken"). Shareholders timely filed their cross-appeal on November 13, 2017, within fourteen days of William's appeal. *See* Pa.R.A.P. 903(b) (except in circumstances not relevant here, "if a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was served, or within the time otherwise prescribed by this rule, whichever period last expires").

not disturb those findings absent manifest error; as an appellate court we can modify an Orphans' Court decree only if the findings upon which the decree rests are not supported by competent or adequate evidence or if there has been an error of law, an abuse of discretion, or a capricious disbelief of competent evidence.

Moreover, we will not reverse the Orphans' Court's credibility determinations absent an abuse of the court's discretion as factfinder. On the other hand, we are not required to give the same deference to the Orphans' Court's legal conclusions. Where the rules of law on which the Orphans' Court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Estate of Edward Winslow Taylor Inter Vivos Tr.*, 169 A.3d. 658, 663 (Pa. Super. 2017) (quoting *In re Trust of Hirt*, 832 A.2d 438, 447 (Pa. Super. 2003) (citations, quotation marks, and some brackets omitted)).

As the issues presented by Shareholders and William are interrelated, we shall address them jointly. William and Shareholders raise the following challenges to the orphans' court's application of the statute of limitations and the discovery rule in the declaratory judgment action.

Whether the trial court erred when it held that the statute of limitations did not bar Plaintiff Susan Kammerer and Melinda McGuigan's claims relative to the Lauer, Stevens, and Baysek transactions and the stock options grant.

* * *

Whether the trial court erred in holding that Plaintiff Harry Kammerer's claims were barred by the statute of limitations.

William's Brief at 1 (Issues A and D).

Whether the trial court erred in determining that Plaintiff Harry S. Kammerer's claims were barred by the statute of limitations, when the evidence presented established that he did not know or have reason to know of the Lauar Transaction, Baysek Transaction, or

- 8 -

the Stock Option Transactions until less than two (2) years before the initiation of the underlying action?

Shareholders' Brief at 7 (Issue 2).

William challenges the orphans' court ruling that Susan and Melinda's claims in the declaratory judgment action were not time-barred. William argues that Susan and Melinda should have filed the declaratory judgment action within four or six years of the Stock Transfers. William's Brief at 10–11 (citing 42 Pa.C.S. §§ 5525, 5527). Because Susan and Melinda did not file their claims until 2015, William contends they were time-barred. *Id.* at 12.

Furthermore, William disputes the orphans' court's conclusion that Susan and Melinda were entitled to application of the discovery rule on two grounds: (1) they "failed to plead any facts in their Amended Complaint [or responsive pleading] to support application of [the rule]" and (2) they did not act with reasonable diligence in seeking to protect their interests. *Id.* at 14–16. According to William, Susan and Melinda took no interest in CLC; yet, as shareholders, they could have asked for corporate records at any time and learned of the Stock Transfers and Stock Options; they also received shareholder meeting minutes, which disclosed the number of outstanding shares. *Id.* at 17–22. In further support of his position, William contends that Susan attended a 1999 meeting at which the number of outstanding shares was announced, giving "her actual knowledge" of an increase in shares. *Id.* at 19. As for Melinda, William contends that she "never took any affirmative steps ... to learn anything about CLC." *Id.* at 22. Therefore,

William concludes, the orphans' court erred in concluding that Susan and Melinda were entitled to the benefit of the discovery rule. *Id.* at 24–25. Lastly, William argues that "the doctrine of equitable estoppel tolling does not apply here. There simply is no evidence that [William and CLC] misled [Shareholders] in any way." *Id.* at 26.

In response, Susan and Melinda argue that competent evidence of record supports the orphans' court's finding that William actively concealed the Stock Transfers by not recording them in the corporate records until 1996, after Harry had been replaced as secretary of CLC. Shareholders' Second Brief at 9–10. According to Susan and Melinda, they had no reason to suspect that William would claim to own a majority interest in CLC or that their interests in CLC had been negatively affected by his conscious disregard for the by-laws. *Id.* at 11, 14. Therefore, Susan and Melinda contend, they did not know or have reason to know of the dilution of their ownership interest in CLC caused by William's engagement in the Stock Transfers or his exercise of the Stock Options. Shareholders' Second Brief at 13, 15.

Shareholders limit their challenge to the orphans' court's ruling that Harry was not entitled to application of the discovery rule. Shareholders' Brief at 38–39. According to Shareholders, Harry may have been aware of the Stevens Transaction in the mid-1990s, but he did not and could not have known about the other two stock transactions or the Stock Options. *Id.* at 42–43. Shareholders argue that no director or shareholder should have to

inspect the books every year to look for fraud; moreover, nothing in the record would have put Harry on notice that William claimed to own 50.88% of CLC stock. *Id.* at 43; Shareholders' Second Brief at 22–23. Shareholders conclude, therefore, that Harry should also benefit from the discovery rule. Shareholders' Brief at 44.

In response, William asserts that Harry acknowledged learning about the Stevens Transaction in 1993–1994. William's Brief at 12–13 (citing Harry's Response to Interrogatory No. 11). William argues that Harry's status as a shareholder, a director, and an officer of CLC provided him "access to all of the records of CLC." *Id.* at 23. William further argues that Harry "attended numerous shareholder meetings after 1995," at which the number of outstanding shares was announced. *Id.* at 23–24. Nevertheless, William asserts, Harry failed to act diligently to protect his interests. *Id.* Therefore, William concludes, the orphans' court did not err in concluding that Harry's claims were time barred. *Id.* at 24–25.

Here, Shareholders requested declaratory judgment regarding the Stock Transfers and Stock Options and claimed breach of fiduciary duty in their complaint against William and CLC. Complaint, 1/16/16, at Counts I and II. "This Court has held that a declaratory judgment action is subject to a four-year statute of limitations." *Ford v. Oliver*, 176 A.3d 891, 899 (Pa. Super. 2017) (citing *Wagner v. Apollo Gas Co.*, 582 A.2d 364, 366 (Pa. Super. 1990)); 42 Pa.C.S. § 5525(8). The statute of limitations for a claim of breach

of fiduciary duty is two years. 42 Pa.C.S. § 5524(7). "[I]t is well-settled that the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." ***Morgan v. Petroleum Products Equipment Co.***, 92 A.3d 823, 828 (Pa. Super. 2014) (citation omitted). Once a cause of action has accrued and the statute of limitations has run, a party alleging damages is prohibited from bringing its cause of action. ***Id.***

The "discovery rule" is an exception to the general rule and may toll the running of the statute. ***Morgan***, 92 A.3d at 828. The discovery rule is a "judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." ***Id.*** (internal citation and quotation marks omitted). ***See also Fine v. Checcio***, 870 A.2d 850, 859 (Pa. 2005) ("[T]he discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises.").

The discovery rule requires "some reason to awaken inquiry and direct diligence" on the part of the plaintiff. ***Fine***, 870 A.2d at 858 (quoting ***Crouse v. Cyclops Industries***, 745 A.2d 606, 611 (Pa. 2000)). When reviewing whether the discovery rule tolls the statute of limitations, this Court will look at whether the plaintiff was reasonably diligent in ascertaining the facts necessary to bring the action. "Once a plaintiff becomes aware of the injury

and who occasioned it, [he] is under a duty to investigate the matter and commence a cause of action." ***Burton-Lister v. Siegel, Sivitz, & Lebed Assocs.***, 798 A.2d 231, 237 (Pa. Super. 2002) (citation omitted). Further, the discovery rule "applies only to those situations where the nature of the injury itself is such that no amount of vigilance will enable the plaintiff to detect an injury." ***Id.*** (quoting ***Dalrymple v. Brown***, 701 A.2d 164, 170 (Pa. 1997)). A plaintiff must show only the level of diligence that a reasonable person would employ under similar facts and circumstances. ***Id.*** (quoting ***Crouse***, 745 A.2d at 611–612).

Similarly, the doctrine of fraudulent concealment may toll the running of the statute. ***Burton-Lister***, 798 A.2d at 237. Where, through fraud or concealment, a defendant causes the plaintiff to relax his vigilance, the defendant is essentially estopped from invoking the statute of limitations as a bar. ***Id.*** Thus, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." ***Fine***, 870 A.2d at 861.

Citing William's conduct, the orphans' court concluded that the discovery rule tolled the statute of limitations as to Susan and Melinda:

> [I]n an effort to conceal information from [Shareholders], [William] did not timely record the purchase of common stock. [William and CLC] provided no plausible explanation for failing to record the purchases seasonably. The unexplained conduct of an undisclosed purchase of common stock in contravention of the by-laws tolled the statute of limitations.

- 13 -

The transactions to which the claims relate occurred well before 1996. [William], together with his wife, acquired the Lauer shares in 1980, the Stevens shares in 1989 and the Baysek shares in 1988. [William and CLC] assign 1996 as the applicable year from which to measure the timeliness of [Shareholders'] claims because 1996 is the year during which each of the transactions was entered into the corporate record. [Shareholders] noted that 1996 is significant in that [Harry] ceased to serve as secretary of [CLC] shortly before the time that the transactions were made part of the corporate records. In his capacity as secretary, Harry would have been the individual responsible to sign any new share certificate. In approximately February 1995, Mark Devlin replaced [Harry] on the board. Mr. Devlin testified that he was unfamiliar with the by-laws of [CLC] and did not become acquainted with any by-laws except on those occasions that an amendment to a particular by-law might be proposed. On such occasions, Mr. Devlin would limit his examination of the by-laws to the particular language that was proposed to be changed. Mr. Devlin was familiar neither with the past acquisitions of stock by William nor with any restrictions that might have applied to such acquisitions.

Only subsequent to Harry's relinquishment of his role as secretary . . . did William cause the transfer of shares from Baysek, Lauer and Stevens to be entered into the corporate records. On that basis, [Shareholders] invoked the "discovery rule" in response to [William and CLC's] assertion that [Shareholders'] claims were time-barred.

* * *

In the case at hand, credible evidence established that William pursued an enlargement of his holdings in [CLC] and, eventually, a controlling interest in that company by disregarding strictures imposed by corporate by-laws. Article XI(a) of the corporate by-laws attempts to preserve the proportionality of shareholder interests by controlling the manner in which shareholders may dispose of their shares. William engaged in the undisclosed direct purchases of shares of stock in the company from shareholders who were disposing of their shares. That conduct precluded a return of the stock to the corporation or pro-rata purchases by other shareholders and was in obvious contradiction of the design and directive of Article] XI(a).

- 14 -

William's direct purchases, occurring in 1980, 1988 and 1989, were not made a matter of record until 1996, shortly after Harry had ceased to serve as secretary of the corporation, a capacity in which Harry would have overseen the recording of any sale and exchange of shares. William's failure to earlier record those transfers precluded discovery by . . . any [shareholder], that William had acquired the shares in a manner other than that permitted under the by-laws. For that reason, the discovery rule was deemed applicable.

* * *

Although William's secretive acquisition of shares of common stock from other shareholders was extraordinary and significant, those events were not seasonably disclosed to any individual [shareholder]. A proper avenue to acquire shares of common stock expeditiously without an offer of sale to [CLC] was available to William under the terms of Article XI . . ., the final sentence of which reads:

> The Corporation and the shareholders may waive the provisions of the By-Law in writing.

No such waiver appears of record. William did not approach other shareholders before pursuing the Stevens, Lauer and Baysek shares of common stock. William disregarded mandated procedure and then failed to seasonably make the acquisitions a matter of corporate record. To the extent that [Shareholders'] claims seek a remedy for the Stevens (1,000 shares), Lauer (80 shares) and Baysek (214 shares) transactions, the claims are viable as to Susan and Melinda under [Shareholders'] fiduciary duty and declaratory judgment count[s].

Susan Kammerer and Melinda McGuigan did not know or have reason to know of the acquisition by William of shares that had been held by Lauer, Stevens and Baysek or of the [Stock Options] until William prepared and provided a February 20, 2014 "Stock Status Report" in response to the request made by counsel during the administration of [Mother's] estate.

* * *

The overriding fact remains . . . that the transfer[s] had been concealed for years and that the transfers were eventually entered

- 15 -

J-A30008-18

onto the record only after a time that any complaint to the board was likely to be futile.

* * *

William caused the transfers to be recorded only after Harry had left [the office of secretary] and the board that was in place concurred with the view that William should acquire a majority interest in the corporation. Recording the Lauer, Stevens and Baysek transactions after 1995 coincided with William's efforts in gaining control of the company. There was little likelihood, therefore, that board members would be supportive of any complaint regarding William's acquisition of shares. Given those circumstances, the discovery rule continued to apply beyond the time that the Lauer, Stevens and Baysek transactions were recorded.

Orphans' Court Opinion, 1/11/18, at 7–8, 9–10, 11 (internal citation omitted).

Citing Harry's knowledge, the orphans' court found that the discovery rule did not toll the statute of limitations on his claims:

Any reliance by [Harry] upon the discovery rule in this case is unavailing. Harry acknowledged during testimony that he had learned sometime in the mid-1990s that William had purchased the shares of George Stevens and had done so .[sic] That knowledge was acquired during a conversation with William that had been prompted by Harry having overheard board members mention the Stevens stock transfer. William had not previously disclosed that transfer to Harry. Nor, apparently, had the transfer been entered seasonably onto corporate records.

The credible evidence in this case is that Harry did not subsequently share the information regarding the Stevens stock transfer with any other sibling.

* * *

Given Harry's knowledge of the Stevens' transfer, a significant transaction of 1,000 shares, and given, further, that William's response to Harry's inquiry suggested that William would have no reservation in pursuing a pattern of such acquisitions, it could be concluded that Harry's failure thereafter to state any formal

- 16 -

objection to the Stevens' transfer or to examine any record that might disclose other transfers should foreclose his claims in this matter. Harry's position on the board would have assisted him in acquiring knowledge of transfers and acquisitions of common stock that occurred in subsequent years. The record confirms attendance by Harry at such meetings. By way of example, Harry was present during a September 15, 2010 board meeting during which the number of outstanding shares of common stock was confirmed to be 18,305, the very number that prompted Susan to make inquiry after [Mother's] estate had opened. Although, given the effort by William to conceal the transactions, a limitations defense is unavailable to [William] as to [Susan and Melinda], Harry cannot pursue a claim as to William.

Orphans' Court Memorandum and Verdict, 10/6/17, at 6–7, 8–9 (footnotes omitted).

Our review of the by-laws confirms the orphans' court's finding that Article XI imposes restrictions on the transfer of CLC shares by a person wishing to sell their shares. Complaint, 1/16/16, at Exhibit 1. Similarly, the record confirms the orphans' court's finding that William directly purchased the outstanding shares of CLC stock owned by Lauer, Stevens, and Baysek without following the procedure set forth in Article XI. N.T. (William Deposition I), 12/23/16, at 9–12, 33–35, 38–44, 62–69, 84–85, 92–93; N.T. (William Deposition II), 1/10/17, at 6–11; N.T. (Trial), 8/29/17, at 36, 41–44, 99–102, 128–132. Additionally, the record supports the orphans' court's finding that William delayed entering the Stock Transfers on the corporate records until September 25, 1996, sixteen, eight, and seven years after William purchased the Lauer, Stevens and Baysek shares, respectively. N.T. (William Deposition I), 12/23/16, at 39–41, 69–70, 102–103; N.T. (Trial),

8/29/17, at 61–62, 311. Notably, when asked by the orphans' court about the dissemination of corporate information, William acknowledged that he "controlled what was disclosed and what was not as to this corporation" to "ensure that there would be no difficulties with regards to any disclosures." N.T. (Trial), 8/30/17, at 342.

The record also supports the orphans' court's finding that the Stock Options were granted at a special director's meeting on February 3, 1995, which Harry did not attend and to which Susan and Melinda did not have access. N.T. (William Deposition I), 12/23/16, at 149–150; N.T. (Harry Deposition), 1/13/17, at 38, 41, 49–50; N.T. (Susan Deposition), 12/13/16, at 18; N.T. (Trial), 8/29/17, at 38, 110, 117, 283. Moreover, the record reveals that Susan and Melinda placed their trust in William as a sibling and as president of CLC. N.T. (Melinda Deposition), 12/13/16, at 40; N.T. (Trial), 8/29/17, at 50–51, 60, 65, 134. They had no reason to question William's exercise of his fiduciary duty as a corporate officer or a trustee of Trust B. N.T. (Trial), 8/29/17, at 59–61, 128–129, 134, 142–143. They did not learn about the Stock Transfers and Stock Options until William disclosed them in his February 20, 2014 Stock Status Report pursuant to a discovery request in the orphans' court action. N.T. (Susan Deposition), 12/13/16, at 22–23, 27; N.T. (Melinda Deposition), 12/13/16, at 28; N.T. (Trial), 8/29/17, at 39–41, 70, 129–130.

Based on the evidence of record, we agree with the orphans' court that Susan and Melinda did not know and could not reasonably have known about the Stock Transfers or Stock Options and the resulting dilution of their ownership interest in CLC until February 2014. Despite his fiduciary duty to Susan and Melinda, William concealed the Stock Transfers and acquired Stock Options, capitalizing on the fact that his sisters were not involved in the operations of CLC and, therefore, would not be aware of any injury to their pecuniary interests in CLC and who occasioned it. *Burton-Lister*, 798 A.2d at 237. William's acquisition of a controlling interest in CLC remained unknown because of the concealed Stock Transfers and his furtive acquisition of the Stock Options, not because Susan and Melinda did not review corporate records. Indeed, nothing in the record demonstrates that Susan and Melinda had reason to believe that they had been injured by William's conduct. Once Susan and Melinda learned of the Stock Transfers and Stock Options in February 2014, they exercised due diligence to determine the cause of the injury, *i.e.*, William's conduct, and filed suit. Thus, we discern no error of law, abuse of discretion, or capricious disbelief of competent evidence in the orphans' court's determination that Susan and Melinda's claims were entitled to the benefit of the discovery rule. *Estate of Edward Winslow Taylor*, 169 A.3d at 663.

As for Harry, the record reveals that he knew about the Stevens Transaction in the mid-1990s; he also knew that the number of outstanding

shares as of the May 23, 2000 shareholder meeting was 18,366. N.T. (Harry Deposition), 12/15/16 at 32–34, 77–78; N.T. (Trial), 8/29/17, at 99–100, 108–109, 121–123. Such knowledge would give Harry reason "to awaken inquiry and direct diligence," and it imposed on Harry "a duty to investigate the matter and commence a cause of action." *Fine*, 870 A.2d at 858; *BurtonLister*, 798 A.2d at 237. Upon learning of the Stevens Transaction, Harry could have exercised due diligence to investigate and learn of William's efforts to gain control of CLC. Harry did not exercise due diligence. Accordingly, we discern no error of law, abuse of discretion, or capricious disbelief of competent evidence in the orphans' court's conclusions that Harry was not entitled to benefit from the discovery rule and, therefore, his claims were time-barred. *Estate of Edward Winslow Taylor*, 169 A.3d at 663.

Next, Shareholders and William challenge the orphans' court award of damages. Shareholders raise this issue in the following question:

> As to the trial court's entry of judgment against Defendant William G. Kammerer, Jr., whether the trial court erred in limiting "the amount of dividends paid to Defendant William G. Kammerer, Jr. in connection with the above referenced stock transfers" (October 5, 2017 Order, ¶ 3) to $44,319.50 and entering judgment thereon, when the evidence of record ([Shareholders'] Exhibit J and Exhibit X) established that the dividends paid to Defendant William G. Kammerer, Jr. "in connection with the above referenced stock transfers" totaled $295,944.50 and judgment therefore should have been entered for this amount?

Shareholders' Brief at 7 (Issue I). William raises this issue in two questions:

> Whether the trial court erred when it held that the [S]tock [O]ptions were void and barred by the corporation Bylaws.

- 20 -

Whether the trial court erred in awarding money damages to [Shareholders].

William's Brief at 1 (Issues B and C).

Shareholders argue that the orphans' court erred in limiting the amount of damages to the dividends attributable to the Stock Transfers, thereby excluding the value of dividends attributable to William's purchase of Treasury Stock shares by exercising the Stock Options. Shareholders' Brief at 33–34. According to Shareholders, Article XI governs the "transfer" of stock ownership, and the Stock Options involve the "transfer" of common stock ownership from one party (the corporate Treasury) to another party (William and his wife). Shareholders' Second Brief at 24. Moreover, Shareholders contend that 15 Pa.C.S. § 1525(e)[6] prevents stock options from being used to gain majority control of a company's stock in violation of preemptive rights, such as those contained in Article XI. *Id.* at 25–26. Therefore, Shareholders conclude, William violated the "right of first refusal" provision of Article XI by

---

[6] This section provides:

**(e) Shares subject to preemptive rights.--**Authorized but unissued shares subject to preemptive rights may be issued and sold pursuant to a plan providing for the issuance of rights or options entitling the holders thereof to purchase shares of the same class or series as the shares subject to such preemptive rights upon the exercise of such rights or options if the plan is approved by the affirmative vote of a majority of the votes cast by the shareholders entitled to exercise such preemptive rights.

15 Pa.C.S. § 1525(e).

exercising the Stock Options. *Id.* at 26–27. Shareholders further argue that the Stock Options resulted from breaches of William's fiduciary duty in an effort to obtain a controlling interest in CLC: He did not provide the two new directors with by-laws; he voted to pay himself bonuses, which he used to exercise the Stock Options; and he exceeded the annual number of exercised Stock Options authorized by the board. *Id.* at 30–33.

In support of their position, Shareholders point to record evidence indicating a difference between compensation William received for his contribution to the success of CLC and dividends, which CLC paid to all shareholders. Shareholders' Brief at 36–37, n.6. They argue that if the Stock Options were void, then William did not own those shares; therefore, he should not be allowed to retain any dividends derived from the ill-gotten shares. *Id.* at 37. Consequently, Shareholders conclude, the judgment against William should be molded to $295,944.50, the full amount of dividends received based on shares William purchased through the unauthorized Stock Transfers and his exercise of the Stock Options. *Id.* at 49.

William counters with several arguments. First, the shareholder meeting minutes explicitly referenced the Stock Options, and CLC's by-laws and Articles of Incorporation do not restrict the grant of stock options. Second, Article XI does not apply to stock options, which are authorized under

15 Pa.C.S. §§ 1525(a) and 1530;[7] those provisions allow a board of directors to issue stock options without first offering them to shareholders of any class or classes. Third, the board of directors validly granted the Stock Options to compensate William for his services and for his personal guarantee of a corporate loan. Finally, William substantially complied with the terms of the Stock Options. William's Brief at 27–33; William's Second Brief at 14–18.

---

[7] These sections provide:

> **(a) General rule.**--Except as otherwise provided in its articles prior to the creation and issuance thereof, a business corporation may create and issue (whether or not in connection with the issuance of any of its shares or other securities) option rights or securities having conversion or option rights entitling the holders thereof to purchase or acquire shares, option rights, securities having conversion or option rights, or obligations, of any class or series, or assets of the corporation, or to purchase or acquire from the corporation shares, option rights, securities having conversion or option rights, or obligations, of any class or series, owned by the corporation and issued by any other person. Except as otherwise provided in its articles, the shares, option rights, securities having conversion or option rights, or obligations shall be evidenced in such manner as the corporation may determine and may be offered without first offering them to shareholders of any class or classes.

> \* \* \*

> **(a) General rule.--**Except as otherwise provided in the articles, a business corporation may issue shares, option rights or securities having conversion or option rights, or obligations without first offering them to shareholders of any class or classes.

15 Pa.C.S. §§ 1525(a) and 1530(a).

In awarding damages to Susan and Melinda, the orphans' court observed the following:

> According to [William and CLC], the Board of Directors set the individual share price and William paid that price. The record also established, however, that the Board would award William both an option and [a] bonus[,] which provided William with the funds to exercise that option. In September 1996, William received a bonus in the amount of $10,000.00, which, after deductions, resulted in a net amount to William of approximately $7,255.00. That amount was deposited into a bank account held jointly by William and his wife. From that account, William wrote a check in the amount of $7,500.00 to exercise the . . . the first option for 1,500 shares. The same process was repeated as to subsequent purchases. William and his wife acquired 7,500 shares in that manner. The effect was cost-free acquisition of shares.
>
> \* \* \*
>
> As [Shareholders] noted, however, among the fiduciary duties owed by William to the trust under Pennsylvania law was to ensure that the company followed the by-laws. The directors who participate[d] in awarding options to William had never been provided with a copy of the by-laws and were unaware of any restrictions placed on stock transfers by the by[-]laws. Whether or not that information would have affected the vote regarding options is unknown. It is known, however, that the grant of options materially benefitted William. Among the tests of a breach of fiduciary duties is whether a director has been enriched by his or her actions. *In re Total Containment, Inc.*, 335 B.R. 589 (Bankr. E.D. Pa. 2005).
>
> An examination of corporate minutes and testimony reveals that the grant of options was intended to enable William to "get control" of the corporation by acquiring, at no cost to him, 7,500 shares of common stock in increments of 1,500. Having acquired shares which had [been] designated as "treasury stock", William effectively grew his ownership of common stock to a greater than fifty percent share and received payment in the form of dividends. Consequently, William was assured both of substantial dividend income and an absolute majority position regardless of any transfer that might be transacted among other shareholders pursuant to [Article] XI(a).

Here, William secured options that enabled him to avoid the strictures of the corporate by-laws and did so according to the vote of a board unfamiliar with those by-laws. For that reason, a breach of fiduciary duty was found to have occurred.

Orphans' Court Opinion, 1/11/18, at 12, 13.

Upon review, we find support in the record for the orphans' court's findings that: (1) the board of directors granted William the Stock Options; (2) the board of directors awarded William bonuses, which he used to exercise the Stock Options on five occasions, thereby acquiring 7,500 shares of Treasury Stock at no personal cost; and (3) the directors who participated in the grant of Stock Options were not provided with the CLC by-laws and were unaware of any restrictions on stock transfers. N.T. (William Deposition I), 12/23/16, at 127, 155–159; N.T. (William Deposition II), 1/10/17, at 12–16, 19, 22–26, 29–30; N.T. (Nuttall Deposition), 1/13/17, at 10–13, 16–17, 39; N.T. (Devlin Deposition), 1/13/17, at 7–8, 14–16; N.T. (Trial), 8/30/17, at 186–187, 193–194, 202, 211, 218, 219, 224, 313. The record further reveals that, although the board authorized William to purchase 1,500 shares of Treasury Stock annually over five years, he did not comply. He exercised the Stock Options on or about May 21, 1997, May 15, 1998, August 31, 1998, August 29, 1999, and January 6, 2000, purchasing 1,500 shares each time. N.T. (William I), 12/23/16, at Exhibit 12.

As for the orphans' court's conclusion that the Stock Options violated Article XI, we discern no error. Article XI imposes restrictions on the transfer of outstanding shares by a shareholder who wishes to sell an interest in CLC.

Complaint, 1/16/16, at Exhibit A.  In comparison, an option is a "right to buy or sell a given quantity of securities . . . at a fixed price within a specified time."  Black's Law Dictionary at 1203 (9th ed. 2009).  A stock option is:

> "an option to buy or sell a specific quantity of stock at a designated price for a specified period regardless of shifts in market value during the period."  An option is "vested" when all conditions attached to it have been satisfied and it may be exercised by the employee.

*Murphy v. McDermott*, 979 A.2d 373, 378 n.7 (Pa. Super. 2009) (quoting *MacKinley v. Messerschmidt*, 814 A.2d 680, 682 (Pa. Super. 2002) (quoting Black's Law Dictionary 1431 (7th ed. 1999)).

Pennsylvania's Corporation Law states, "**Except as otherwise provided in its articles** prior to the creation and issuance thereof, a business corporation may create and issue option rights. . . ."  15 Pa.C.S. § 1525(a) (emphasis supplied).  Shareholders do not identify a CLC article that restricts the grant of stock options by CLC to an employee.  Thus, CLC was authorized to grant William stock options for the purchase of Treasury Stock shares, *i.e.*, "[i]ssued shares of corporate stock that are not outstanding and held by the company[.]" N.T. (William Deposition II), 1/10/17, at 14.  Although William's exercise of the Stock Options resulted in the transfer of Treasury Stock shares from CLC to William, the Stock Options themselves were not a transfer of shares.  They were a right to purchase Treasury Stock shares from CLC once all conditions of the grant had been satisfied.  In the case at hand, the Stock

Options vested when William signed the personal guarantee for the $1.24 million loan on behalf of CLC.

Although we conclude that the Stock Options did not violate Article XI, we discern no error in the orphans' court's conclusion that William's acquisition and exercise of the Stock Options constituted a breach of his fiduciary duty as an officer and director of CLC and a trustee of Trust B. Pennsylvania's Corporation Law states:

> Authorized but unissued shares subject to preemptive rights may be issued and sold pursuant to a plan providing for the issuance of rights or options entitling the holders thereof to purchase shares of the same class or series. . . if the plan is approved by the affirmative vote of a majority of the votes cast by the shareholders entitled to exercise such preemptive rights.

15 Pa.C.S. § 1525(e). Here, Shareholders presented evidence that the "plan" to grant William the Stock Options was not approved by the affirmative vote of a majority of the votes cast by the shareholders entitled to exercise such preemptive rights. Rather, William and the board of directors voted on the Stock Options at the February 3, 1995 special director meeting, without including the shareholders entitled to exercise preemptive rights. N.T. (William Deposition I), 12/23/16, at 149–150; N.T. (Harry Deposition), 1/13/17, at 38, 41, 49–50; N.T. (Susan Deposition), 12/13/16, at 18; N.T. (Trial), 8/29/17, at 38, 110, 117, 283.

Additionally, although the record is unclear as to the bonus valuation process, the board of directors awarded William bonuses. N.T. (William Deposition II), 1/10/17, at 15–17; N.T. (Nuttall Deposition), 1/13/17, at 29–

31; N.T. (Devlin Deposition), 1/13/17, at 16; N.T. (Trial), 8/30/17, at 303, 306–307. As a member of the board, William voted himself the Stock Options and bonuses; by his own admission, he saw no conflict of interest in doing so. N.T. (William Deposition I), 12/23/16, at 157; N.T. (William Deposition II), 1/10/17, at 21–22. The record is also unclear as to how the Treasury Stock shares were valued at $5.00 per share, but it does reveal that William used the bonuses to exercise the Stock Options on five occasions, thereby acquiring 7,500 Treasury Stock shares—and a controlling interest in CLC—at no personal cost, to the diminution of Shareholders' interests. N.T. (William Deposition I), 12/23/16, at Exhibit 12; N.T. (William Deposition II), 1/10/17, at 19–21, 22–31; N.T. (Nuttall Deposition), 1/13/17, at 22–24; N.T. (Devlin Deposition), 1/13/17, at 11; N.T. (Trial), 8/30/17, at 202, 291–293.

Furthermore, we consider William's claim that Nuttall and Devlin were disinterested parties disingenuous. In his own words, William required an assurance that he would "be able to control the destiny of the company which [he was] guaranteeing." N.T. (William Deposition I), 12/23/16, at 134. He believed that "being in a position to determine the makeup of the Board of Directors [would] give [him] that assurance." *Id.* William handpicked Nuttall and Devlin as directors to fill two empty seats on the board three weeks before the special directors' meeting, and they supported his gaining control of CLC through the Stock Options; thus, they voted for the grant of Stock Options. N.T. (William Deposition I), 12/23/16, at 118–120, 158; N.T. (Nuttall

Deposition), 1/13/17, at 26; N.T. (Trial), 8/30/17, at 190, 196–197. However, William did not provide those directors with corporate records or by-laws, and they did not read any records or by-laws before granting the Stock Options. N.T. (William Deposition I), 12/23/16, at 156–157; N.T. (Nuttall Deposition), 1/13/17, at 10–12; N.T. (Devlin Deposition), 1/13/17, at 7, 11–12, 26; N.T. (Trial), 8/30/17, at 186–187, 202, 211, 218, 224. In fact, Devlin acknowledged that William would prepare documents and present them to Devlin for signature; as Secretary of CLC, Devlin was not required to maintain the accuracy of the stock ledger. N.T. (Devlin Deposition), 1/13/17, at 17, 20, 24.

Finally, William was aware of his fiduciary duty as to Shareholders as an officer and director of CLC and as a trustee of Trust B; he acknowledged his duty to treat all shareholders the same. He also acknowledged that he did not consider what effect exercising the Stock Options would have on the value of the Trust B shares. N.T. (William Deposition I), 12/23/16, at 16–17, 19, 24, 130–131; N.T. (Trial), 8/30/17, at 329, 345. Nevertheless, by his own admission, William "would not sign a personal guarantee as required or an Environmental Indemnity Agreement as required [for the loan] if [he] didn't have some mechanism for being in control of [CLC]." N.T. (William Deposition I), 12/23/16, at 127, 129, 134. The Stock Options assured William a controlling interest in CLC. *Id.* at 155; N.T. (Trial), 8/30/17, at 197. In the meantime, William would "continue to vote the stock in [Trust B], and, being

able to do that, [he] would have control over the operation of the company." N.T. (Trial), 8/30/17, at 317.

Based on the evidence of record, we discern no error of law, abuse of discretion, or capricious disbelief of competent evidence in the orphans' court's conclusion that William breached his fiduciary duty to the Shareholders and Trust B by voting for and exercising the Stock Options in order to gain a controlling interest in CLC. **Estate of Edward Winslow Taylor**, 169 A.3d at 663. That being said, we next consider whether the orphans' court erred in denying Susan and Melinda damages for that breach.

The orphans' court awarded Susan and Melinda $44,319.50, the amount of dividends attributable to the Stock Transfers, which violated Article XI. Orphans' Court Opinion, 1/11/18, at 14. However, it did not award money damages for William's acquisition of the Stock Options to obtain control of CLC because, it opined, the proper remedy for that conduct was rescission of those options. Orphans' Court Memorandum and Verdict, 10/6/17, at 14. Nor did the orphans' court award Susan and Melinda money damages for William's exercise of the Stock Options and resulting dividends ($251,625), finding the Stock Options to be compensation for his personal guarantee of a substantial corporate loan. According to the orphans' court, Shareholders "did not demonstrate that the personal guarantee William proffered to assure a loan to the corporation was . . . devoid of any value" or that compensation for that

guarantee "was unconscionable." Orphans' Court Opinion, 1/11/18, at 14–15.

Upon review, we conclude that the record does not support the orphans' court's "compensation" finding. Orphans' Court Opinion, 1/11/18, at 14–15. The Stock Options were, in fact, consideration for William's signature on the personal and environmental guarantees and the means to acquire control of CLC. N.T. (William Deposition I), 12/23/16, at 127; N.T. (Trial), 8/30/17, at 197, 200, 280–282. William and the board of directors granted the Stock Options in violation of 15 Pa.C.S. § 1525(e). Moreover, William voted himself bonuses so he could exercise the Stock Options, and he exceeded the number of Stock Options permitted annually to accelerate obtaining control. Thus, we agree with the orphans' court that "[t]he impropriety was in the award of options calculated to award control of the corporation to William." Orphans' Court Opinion, 1/11/18, at 15. As a result of William's self-dealing, the number of outstanding shares of CLC stock increased, thereby diluting the value of Shareholders' and Trust B's holdings. N.T. (Susan Deposition), 1/13/17, at 41–45. Accordingly, we conclude that William is not entitled to retain the value of dividends paid on the Treasury Stock shares he purchased by exercising the Stock Options because, as the orphans' court found, he breached his fiduciary duty to Shareholders and Trust B. Order, 10/6/17, at 2. We further conclude the orphans' court erred as a matter of law in limiting the award of damages to the $44,319.50 of dividends William received on the

shares obtained through the Stock Transfers. Thus, we reverse that part of the order denying Susan and Melinda an award of damages that included the value of dividends paid on the 7,500 shares William purchased by exercising the Stock Options, *i.e.*, $251,625, and we remand for the entry of judgment including that amount.

Estate's application for relief granted. Orphans' Court order affirmed in part, reversed in part, and case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/1/2019